- NONCONFIDENTIAL -

2014-1506, -1515

# United States Court of Appeals
# for the Federal Circuit

———————————————

INTELLECTUAL VENTURES I LLC and
INTELLECTUAL VENTURES II LLC,

*Plaintiffs-Appellants*,

v.

CAPITAL ONE FINANCIAL CORPORATION,
CAPITAL ONE BANK (USA), NATIONAL ASSOCIATION, and
CAPITAL ONE, NATIONAL ASSOCIATION,

*Defendants-Cross-Appellants*.

———————————————

Appeals from the United States District Court for the Eastern District of Virginia
in No. 1:13-cv-00740-AJT-TCB, Judge Anthony J. Trenga.

———————————————

## BRIEF OF CROSS-APPELLANTS

———————————————

Jeffrey G. Homrig
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025

Robert A. Angle
Dabney J. Carr IV
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, VA 23219
(804) 697-1246

Matthew J. Moore
Abbott B. Lipsky, Jr.
J. Scott Ballenger
Marguerite M. Sullivan
Gabriel K. Bell
LATHAM & WATKINS LLP
555 Eleventh St. NW, Suite 1000
Washington, DC 20004
(202) 637-2200
matthew.moore@lw.com
*Counsel for Cross-Appellants*

## CERTIFICATE OF INTEREST

Counsel for Cross-Appellants certifies the following:

1. The full name of every party or amicus curiae represented by me is:

   Capital One Financial Corporation;
   Capital One Bank (USA), National Association; and
   Capital One, National Association

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   N/A

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   Capital One Financial Corporation, a publicly held company, is the parent corporation of—and owns more than 10% of the stock of—Capital One Bank (USA), National Association and Capital One, National Association.

   Capital One Financial Corporation has no parent corporation and, as of the most recent Form 13F filings, no publicly held corporation owns more than 10% of its stock.

4.  The names of all law firms and the partners or associates that appeared for the party or amicus curiae now represented by me in the trial court or agency or are expected to appear in this court are:

> **Latham & Watkins LLP**: Matthew J. Moore, Jeffrey G. Homrig, Abbott B. Lipsky, Jr., Marguerite M. Sullivan, J. Scott Ballenger, Jonathan D. Link, Gabriel K. Bell, Alan J. Devlin, Peter O. Schmidt, Gabrielle Z.A. Kohlmeier, Anthony J. Zappin, Jennifer M. Halbleib, Patricia Young, Linfong Tzeng, Shoney H. Blake, Joseph H. Lee, Neil A. Rubin, Andrew J. Fossum, Cassius K. Sims

> **Troutman Sanders LLP:** Robert A. Angle, Dabney J. Carr IV, Catherine Zinsner, S. Mohsin Reza, Glenn B. Manishin, Kenneth Alexander Godlewski, Eric Michael Jaegers

Dated: October 14, 2014

Respectfully submitted,

/s/ Matthew J. Moore
Matthew J. Moore
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004

*Counsel for Cross-Appellants*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF AUTHORITIES ...................................................................vi

STATEMENT OF RELATED CASES ....................................................1

STATEMENT OF THE ISSUES..............................................................2

STATEMENT OF THE CASE...................................................................4

    A.    IV Is A Patent Assertion Entity That Has Monopolized A Banking-Technology Market ...................................................5

    B.    The Patents-in-Suit ......................................................................8

        1.    '137 Patent (Budgeting)............................................8

        2.    '382 Patent (Customizing Web Pages) ....................10

        3.    '587 Patent (Organizing Images)..............................12

    C.    District Court Proceedings ................................................13

        1.    Dismissal Of Capital One's Antitrust Counterclaims Without Discovery ..................................................14

        2.    Claim Construction ................................................15

        3.    Stipulated Judgment Of Non-Infringement Of '587 Patent Claims And Voluntary Dismissal Of Most Other Claims ...................................................16

        4.    Summary Judgment Of Invalidity Of All Remaining '137 And '382 Patent Claims..................................16

SUMMARY OF THE ARGUMENT ....................................................18

ARGUMENT ...................................................................................23

**Page**

*IV's Appeal* ........................................................................................23

I.  THE '137 AND '382 PATENT CLAIMS ARE INVALID
    UNDER § 101 ..............................................................................23

    A.  The '137 Patent Claims Are Not Patent-Eligible ...............26

        1.  The Claims Are Directed To The Abstract Idea Of
            Budgeting .................................................................26

        2.  The Claims Add Nothing Inventive To The Abstract
            Budgeting Idea ........................................................28

    B.  The '382 Patent Claims Are Not Patent-Eligible ...............36

        1.  The Claims Are Directed To The Abstract Idea Of
            Customizing A Web Page ........................................36

        2.  The Claims Add Nothing Significant To The Abstract
            Web Page-Customization Idea ................................38

    C.  IV Misunderstands *Alice*'s Two-Step Analytical Framework ...........41

II. THE '382 PATENT CLAIMS ARE INDEFINITE UNDER § 112(b) .........43

    A.  The District Court Properly Found The Claims Indefinite ................44

    B.  IV's Complaints About The Process Are Unfounded ........................46

III. THE DISTRICT COURT PROPERLY CONSTRUED THE
     DISPUTED TERM OF THE '587 PATENT ...............................................49

    A.  IV Has Forfeited Its Challenge To The District Court's Non-
        Infringement Judgment ........................................................50

    B.  The District Court Correctly Held IV To The Patent Applicants'
        Representations To The Patent Examiner ...........................51

    C.  IV's Perfunctory Challenge To The District Court's
        Construction Is Baseless ......................................................54

**Page**

*Capital One's Cross-Appeal* ......................................................55

I.     STANDARD OF REVIEW ...............................................55

II.    IV'S SCHEME TO MONOPOLIZE A TECHNOLOGY MARKET
       PLAUSIBLY VIOLATED THE SHERMAN ACT ...................55

       A.    Capital One Alleged A Plausible Scheme Of Anticompetitive
             Conduct.......................................................................57

             1.    Capital One Does Not Have To Compete With IV To
                   Challenge Monopolization.........................................57

             2.    The District Court Wrongly Assumed That Market Power
                   Flowing From Patent Grants Is Necessarily Lawful.................58

             3.    *Noerr-Pennington* Does Not Immunize IV's Conduct.............61

       B.    Capital One's Market Allegations Are Sufficient At This Stage........65

             1.    The Plaintiff And Defendant Need Not Compete.....................65

             2.    Capital One's Market Definition Allegations Easily
                   Suffice ......................................................................66

       C.    Capital One Plausibly Alleged Monopoly Power ...............................69

       D.    Capital One Has Suffered Antitrust Injury.........................................71

       E.    Capital One At Least Plausibly Pled *Attempted* Monopolization .......72

III.   IV's ANTICOMPETITIVE ACQUISITIONS PLAUSIBLY
       VIOLATED SECTION 7 OF THE CLAYTON ACT .................72

CONCLUSION ..................................................................................74

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted on pages 5-7, 20-22, 66, 70-71 and 73 relates to confidential business information subject to a protective order.

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Accenture Global Services v. Guidewire Software, Inc.*,
    728 F.3d 1336 (Fed. Cir. 2013), *cert. denied*,
    134 S. Ct. 2871 (2014)...........................................................27, 33, 34, 35, 38

*Advanced Health-Care Services, Inc. v. Radford Community Hospital*,
    910 F.2d 139 (4th Cir. 1990) ........................................................................71

*In re Alappat*,
    33 F.3d 1526 (Fed. Cir. 1994) ......................................................................42

*Alice Corp. Pty. Ltd. v. CLS Bank International*,
    134 S. Ct. 2347 (2014)............................................................................*passim*

*Aventis Pharma S.A. v. Hospira, Inc.*,
    675 F.3d 1324 (Fed. Cir. 2012) ....................................................................30

*Ballard v. Bank of America, N.A.*,
    734 F.3d 308 (4th Cir. 2013) ........................................................................55

*Bancorp Services, L.L.C. v. Sun Life Assurance Co. of Canada*,
    687 F.3d 1266 (Fed. Cir. 2012), *cert. denied*,
    134 S. Ct. 2870 (2014)................................................................28, 33, 35, 39

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).......................................................................................55

*Bilski v. Kappos*,
    130 S. Ct. 3218 (2010).....................................................23, 24, 26, 27, 38

*Biogen Idec, Inc. v. Glaxosmithkline LLC*,
    713 F.3d 1090 (Fed. Cir. 2013) ....................................................................51

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*,
    441 U.S. 1 (1979)..................................................................................59, 68

**Page(s)**

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (2007) ..................................................................14

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)...................................................................71

*buySAFE, Inc. v. Google, Inc.*,
    765 F.3d 1350 (Fed. Cir. 2014) ..................................27, 37, 39, 42

*California Motor Transport Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972)...................................................................63

*City of Columbia v. Omni Outdoor Advertising, Inc.*,
    499 U.S. 365 (1991)...................................................................64

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,
    690 F.2d 1240 (9th Cir. 1982) ....................................................62

*Continental Ore Co.. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962)...................................................................62

*Cyberfone Systems, LLC v. CNN Interactive Group, Inc.*,
    558 F. App'x 988 (Fed. Cir. 2014) ..............................................35

*CyberSource Corp. v. Retail Decisions, Inc.*,
    654 F.3d 1366 (Fed. Cir. 2011) .....................................28, 34, 35

*Dairy Foods Inc. v. Dairy Maid Products Cooperative*,
    297 F.2d 805 (7th. Cir. 1961) .....................................................72

*Dealertrack, Inc. v. Huber*,
    674 F.3d 1315 (Fed. Cir. 2012) ...........................................*passim*

*Diamond v. Diehr*,
    450 U.S. 175 (1981)...................................................................32

*Digitech Image Technologies, LLC v. Electronics for Imaging, Inc.*,
    758 F.3d 1344 (Fed. Cir. 2014) ............................................34, 37

**Page(s)**

*E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc.,*
  637 F.3d 435 (4th Cir. 2011) .................................................................65, 66

*Eastman Kodak Co. v. Image Technical Services, Inc.,*
  504 U.S. 451 (1992).....................................................14, 65, 66, 68, 69

*Fort Properties, Inc. v. American Master Lease LLC,*
  671 F.3d 1317 (Fed. Cir. 2012) ...........................................................28, 34

*FTC v. Actavis, Inc.,*
  133 S. Ct. 2223 (2013)...............................................................56, 58, 70, 73

*Gottschalk v. Benson,*
  409 U.S. 63 (1972)...................................................................................24, 31

*H.J., Inc. v. International Telephone & Telegraph Corp.,*
  867 F.2d 1531 (8th Cir. 1989) ........................................................................72

*H-W Technology, L.C. v. Overstock.com, Inc.,*
  758 F.3d 1329 (Fed. Cir. 2014) ...................................................................47

*Intellectual Ventures I LLC v. Symantec Corp.,*
  2014 WL 4773954 (D. Del. Sept. 24, 2014) ..............................22, 56, 59, 60

*Interactive Gift Express, Inc. v. Compuserve Inc.,*
  256 F.3d 1323 (Fed. Cir. 2001) ...................................................................49

*Interval Licensing LLC v. AOL, Inc.,*
  --- F.3d ---, 2014 WL 4435871 (Fed. Cir. Sept. 10, 2014)...........................44

*Key Pharmaceuticals v. Hercon Laboratories Corp.,*
  161 F.3d 709 (Fed. Cir. 1998) ......................................................................49

*Kobe, Inc. v. Dempsey Pump Co.,*
  198 F.2d 416 (10th Cir. 1952) ......................................................................58

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.,*
  132 S. Ct. 1289 (2012)...............................................................24, 29, 31, 37

**Page(s)**

*Meredith Corp. v. SESAC, LLC*,
2011 U.S. Dist. LEXIS 24517 (S.D.N.Y. Mar. 9, 2011)..................14, 60, 68

*Meredith Corp. v. SESAC LLC*,
1 F. Supp. 3d 180 (S.D.N.Y. 2014) ............................................................68

*Microsoft Corp. v. Multi-Tech Systems, Inc.*,
357 F.3d 1340 (Fed. Cir. 2004) ...................................................................53

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
134 S. Ct. 2120 (2014)............................................................43, 44, 46, 47

*Newcal Industries, Inc. v. IKON Office Solutions, Inc.*,
513 F.3d 1038 (9th Cir. 2008) .....................................................................66

*North American Container, Inc. v. Plastipak Packaging, Inc.*,
415 F.3d 1335 (Fed. Cir. 2005) ...................................................................54

*Northern Telecom Ltd. v. Samsung Electronics Co.*,
215 F.3d 1281 (Fed. Cir. 2000) ...................................................................49

*O'Reilly v. Morse*,
56 U.S. (15 How.) 62 (1854) .......................................................................24

*Parker v. Flook*,
437 U.S. 584 (1978)...................................................................24, 31, 37, 42

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ...................................................................51

*Primetime 24 Joint Venture v. NBC*,
219 F.3d 92 (2d Cir. 2000) ..........................................................................63

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*,
508 U.S. 49 (1993)........................................................................................63

*Radio Music License Committee, Inc. v. SESAC, Inc.*,
2014 WL 2892391 (E.D. Pa. June 26, 2014)........................................59, 60

**Page(s)**

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979)................................................................57

*Rhine v. Casio, Inc.*,
183 F.3d 1342 (Fed. Cir. 1999) ..................................48

*Ritz Camera & Image, LLC v. SanDisk Corp.*,
700 F.3d 503 (Fed. Cir. 2012) ..............................57

*Saffran v. Johnson & Johnson*,
712 F.3d 549 (Fed. Cir. 2013) ........................51, 53

*Seachange International, Inc. v. C-COR, Inc.*,
413 F.3d 1361 (Fed. Cir. 2005) ........................53

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993)................................................72

*Superior Industries, LLC v. Thor Global Enterprises Ltd.*,
700 F.3d 1287 (Fed. Cir. 2012) ..............................55

*Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*,
279 F.3d 1357 (Fed. Cir. 2002) ..............................48

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001) ..............................66

*Tyco Healthcare Group LP v. Mutual Pharmaceutical Co.*,
762 F.3d 1338 (Fed. Cir. 2014) ..............................63

*United States v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956)................................................69

*United States v. E.I. du Pont de Nemours & Co.*,
353 U.S. 586 (1957)........................................65, 73

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966)........................................56, 67

**Page(s)**

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001)..........................................................70

*United States v. Philadelphia National Bank*,
   374 U.S. 321 (1963)...............................................................67, 73

*United States v. Singer Manufacturing  Co.*,
   374 U.S. 174 (1963)....................................................................58

*United States v. Westinghouse Electric Corp.*,
   648 F.2d 642 (9th Cir. 1981) .......................................................58

*Uship Intellectual Properties, LLC v. United States*,
   714 F.3d 1311 (Fed. Cir. 2013) .............................................51, 53

*USS-POSCO Industries v. Contra Costa County Building & Construction
   Trades Council, AFL-CIO*,
   31 F.3d 800 (9th Cir. 1994) .........................................................63

*Waugh Chapel South, LLC v. United Food & Commercial Workers Union
   Local 27*,
   728 F.3d 354 (4th Cir. 2013) .......................................................63

*Xerox Corp.*,
   86 F.T.C. 364 (1975) ..................................................................60

## STATUTES

15 U.S.C. § 2..................................................................3, 55, 72

15 U.S.C. § 18 ....................................................................3, 72

15 U.S.C. § 26 ........................................................................65

35 U.S.C. § 101 ..................................................................2, 23

35 U.S.C. § 112(b) .............................................................2, 44

xi

Page(s)

## OTHER AUTHORITIES

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2014) ...........................57

John R. Bartizal, *Budget Principles and Procedure* (1942) ...................................26

S. Agnes Donham, *Spending the Family Income* (1933).......................................26

FTC, *The Evolving IP Marketplace: Aligning Patent Notice and Remedies
    with Competition* (2011), *available at*
    http://www.ftc.gov/sites/default/files/documents/reports/evolving-ip-
    marketplace-aligning-patent-notice-and-remedies-competition-report-
    federal-trade/110307patentreport.pdf .......................................................7, 68

U.S. DOJ & FTC, *Horizontal Merger Guidelines* (2010), *available at*
    http://www.justice.gov/atr/public/guidelines/hmg-2010.pdf .......................73

U.S. Gov't Accountability Office, GAO-13-465, *Intellectual Property: As-
    sessing Factors That Affect Patent Infringement Litigation Could
    Help Improve Patent Quality* (2013) .......................................................8, 64

*Virginia Court Dismisses Patents in First Case Against Capital* One, Intel-
    lectual Ventures (Apr. 16, 2014),
    http://www.intellectualventures.com/news/legal-updates/virginia-
    court-dismisses-patents-in-first-case-against-capital-one/ .............................7

## STATEMENT OF RELATED CASES

This case was not previously on appeal before this or any other appellate court.  Intellectual Ventures I LLC and Intellectual Ventures II LLC (collectively "IV") has numerous pending district court actions alleging infringement of the same patents at issue here.  *See*, *e.g*., *Intellectual Ventures I LLC, et al. v. HSBC USA, Inc., et al*, No. 1:13-cv-5386-WHP (S.D.N.Y. filed Aug. 1, 2013); *Intellectual Ventures I LLC, et al. v. Bank of America Corp. et al*., No. 3:13-cv-358-RJC-DSC (W.D.N.C. filed June 12, 2014); *Intellectual Ventures I, LLC, et al. v. Fifth Third Bancorp et al*., No. 1:13-cv-378-MRB (S.D. Ohio June 4, 2013); *Intellectual Ventures I LLC, et al. v. PNC Fin. Servs. Grp., Inc., et al.*, No. 2:13-cv-740-AJS (W.D. Pa. filed May 29, 2013).  This Court's decision may directly affect those cases.  Also, although involving different patents, this Court's decision may directly affect *Intellectual Ventures I LLC, et al. v. Capital One Financial Corp., et al.*, No. 8:14-cv-111-PWG (D. Md. filed Jan. 15, 2014), and other cases involving similar antitrust issues.

## STATEMENT OF THE ISSUES

### *IV's Appeal*

1.  Whether the district court correctly held that the asserted claims of U.S. Patent Nos. 8,083,137 ("'137 patent") and 7,603,382 ("'382 patent") are invalid for lack of patent-eligible subject matter under 35 U.S.C. § 101 because they are directed to abstract ideas—(a) monitoring expenses against a pre-set budget and (b) tailoring web site content to a user's personal information and browsing history, respectively—and at most require the type of general-purpose computer implementation that the Supreme Court found insufficient to make claims patent-eligible in *Alice Corp. Pty. Ltd. v. CLS Bank International*, 134 S. Ct. 2347 (2014).

2.  Whether the district court correctly granted summary judgment that the asserted '382 patent claims are invalid under 35 U.S.C. § 112(b) because the term "interactive interface," when viewed in light of the specification and construed as IV proposed, fails to provide "reasonable certainty" of the metes and bounds of the claims under *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014).

3.  Whether the district court correctly construed the "digitally scanning . . ." phrases in the asserted claims of U.S. Patent No. 7,260,587 ("'587 patent") to reflect the patent applicants' representation to the examiner that these limitations require the physical step of scanning a hard copy instruction form, after which representation the examiner granted the claims.

*Capital One's Cross-Appeal*

4. Whether Capital One plausibly alleged that IV monopolized—or attempted to monopolize—a technology-licensing market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, by secretly amassing 3,500 patents targeted at the banking industry to create a bottleneck so that banks cannot operate without either buying a license at a price far higher than what those companies would have paid in the competitive licensing market when the patents were in separate hands or facing endless litigation.

5. Whether Capital One plausibly alleged that the acquisition of 3,500 patents by IV, a patent-assertion entity having the incentive and ability to raise price, violates Section 7 of the Clayton Act, 15 U.S.C. § 18, where those acquisitions gave IV the power to dramatically increase the price of a license.

## STATEMENT OF THE CASE

In June 2013, IV brought this suit against Capital One alleging infringement of five IV patents.  A1.  In October 2013, Capital One filed counterclaims alleging that IV had violated the antitrust laws through anticompetitive patent acquisitions to hold-up the banking industry.  A5001-41.  IV refused to produce any antitrust discovery, despite Capital One's repeated requests.  In December 2013, the district court granted IV's motion to dismiss the counterclaims with prejudice.  A5182-83; *see* 2013 WL 6682981 (E.D. Va. Dec. 18, 2013).  In the court's view, Capital One had not plausibly alleged a relevant market, monopoly power, anticompetitive conduct, or facts sufficient to deny IV immunity under the *Noerr-Pennington* doctrine.  A5182-201.

Also in December 2013, the district court construed various claim terms.  A752-60.  Shortly thereafter, IV stipulated to non-infringement of one patent (the '587 patent) based on that claim construction.  A761-63; A5415-20; A777-78.  IV also voluntarily dismissed its claims on two other patents (not at issue in this appeal).  A5414; A5421.  In April 2014, the district court granted summary judgment of invalidity as to the only remaining asserted claims of the last two patents (the '137 patent and the '382 patent).  A779-93; *see* 2014 WL 1513273 (E.D. Va. Apr. 16, 2014).  IV appealed as to its patent claims, A794, and Capital One cross appealed as to its antitrust counterclaims, A5609-13.

**CONFIDENTIAL MATERIAL OMITTED**

**A.    IV Is A Patent Assertion Entity That Has Monopolized A Banking-Technology Market**

IV is a patent-assertion entity that targets "the world's most innovative and successful technology companies."  A4 ¶ 11.  Its business model is to create a patent portfolio so vast and obscure that companies cannot operate in the banking industry without paying IV's license demand or facing an endless series of patent infringement suits by IV, granting IV monopoly power in licensing patents that were otherwise available at competitive prices.  A5026 ¶ 62; A5029 ¶¶ 68, 70; A5032-33 ¶¶ 74(d), 76.  IV first identifies technologies underlying targeted banking firms' products and services.  A5028 ¶ 66.  IV then amasses patents to "build[] walls of patents around [banks'] businesses[,]" including any perceived "Invention Gap."  *Id.*; A5027 ¶ 63.  It also intentionally acquires patents to foreclose "escape avenues" in the form of "redesigned alternative" banking products.  A5029 ¶ 69.  And IV intentionally does not provide any products or services in the banking industry to avoid any threat of countersuit.

IV accomplishes this goal by handpicking weak patents with broad claims that facilitate "sweeping claims of infringement."  A5029 ¶ 68; *see* A5211.  IV admits that it [[

            ]] A5211, and that it selected those patents [[

                                                    ]]  A5304;  *see*  A5298

[[

]] A5344 [[

]]    To effect "submarine hold-up," IV employs 2,000 shell companies "to conceal its patent acquisitions so that targets have no idea" where the portfolio ends and to "ensure that, when Intellectual Ventures does launch an attack, its targets cannot assess or value its portfolio, and thus . . . cannot . . . avoid Intellectual Ventures' infringement claims by redesigning their accused products or processes." A5027 ¶ 63. IV has assembled "the largest portfolio of active patent assets in the world[,]" comprising 80,000 patents and applications. A5026 ¶ 62.

Targeting the banking industry, IV bought competitively priced financial-services patents and amassed them into a 3,500-patent portfolio. A5030 ¶ 72. IV created that portfolio to attack banks' current and alternative product lines. A5029 ¶ 69. IV charges prices far surpassing what it paid for those 3,500 patents or what the previous owners could have charged. *See* A5032 ¶ 74(d); A5034 ¶ 78; A5309; A5339. Indeed, IV has extracted hundreds of millions of dollars per licensee. A5029-30 ¶¶ 70-71. IV calculates that [[

]]

A5309. For [[                  ]] a license even to one [[

]] A5339. The most that IV has ever claimed to spend on acquiring its 80,000 patent assets are "hundreds of millions of dollars," which [[

**CONFIDENTIAL MATERIAL OMITTED**

]]     A4   ¶ 11.     Illustratively, IV held up Verizon Communications for $350 million, Intuit Inc. for $120 million, and Cisco Systems, Inc. for between $200 million and $400 million.  A5029 ¶ 70.  It is an open secret that IV has market power in technology markets:  "IV's ability to assert a virtual armada of patents gives it an unusually strong bargaining position."  FTC, *The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition* 66 (2011).

If a target refuses to pay IV's demanded prices, IV credibly threatens endless infringement litigation, without regard to the actual merits.  A5029 ¶ 69; 5032 ¶ 74; *see* A5222 [[

]]  Success against IV in one lawsuit just means having to defend more, as its litigation track record shows.  A5032 ¶ 74(e).  Indeed, Capital One defeated every one of IV's first five patents, after which IV announced that "our patent portfolio is deep and we have another action pending against Capital One in Maryland."[1]

The nature of that serial litigation ensures that the costs IV imposes on its targets dwarfs its own.  A5014; A5032 ¶ 74(e).  Since IV merely acquired the

---

[1]   http://www.intellectualventures.com/news/legal-updates/virginia-court-dismisses-patents-in-first-case-against-capital-one/.

7

patents, it has limited discoverable information. *See* U.S. Gov't Accountability Office, GAO-13-465, *Intellectual Property: Assessing Factors That Affect Patent Infringement Litigation Could Help Improve Patent Quality* 3 & n.8, 10 (2013). Large defendants, in contrast, have millions of pages of documents regarding the accused services. The "asymmetry in litigation costs" gives non-practicing entities like IV "leverage in seeking financial compensation from operating companies." *Id.* That dynamic, coupled with the secrecy in which IV shrouds its portfolio, leaves IV's targets with no choice and allows IV to demand (and get) far more for its portfolio licenses than the prior owners of the individual patents could command before IV acquired them. A5029 ¶ 69; A5033 ¶ 76; A5034 ¶ 78.

### B.    The Patents-in-Suit

The three IV patents at issue in this appeal are the '137 patent (directed to budgeting), the '382 patent (directed to customizing web pages), and the '587 patent (directed to organizing images).

### 1.    '137 Patent (Budgeting)

The '137 patent relates to the basic idea of budgeting—allowing a user to categorize and monitor expenditures against self-imposed limits. A58-72. The specification explains that many people need to be on a "rigid budget[]" to avoid "financial difficulty." A67 (1:22, 1:44). Even the "most disciplined person," the specification observes, can benefit from setting "spending limits" to help make

good "purchasing decisions."  A67 (1:24, 1:29, 1:37).  The specification describes a purportedly innovative solution whereby users establish a "profile" with "pre-establish[ed] self-imposed limits (guidelines) on a category by category basis"—such as for food, clothing, and travel—shown below in Figure 5.  A67 (2:9-11); A68 (3:35-36, 3:53-55); A70 (8:42-52) (limits shown in Amount column).

50

FIG. 5

| CATEGORY | CODE | AMOUNT | PRIORITY | ACCOUNTING PERIOD | ADJUSTMENT AMOUNT | ADJUST | USER (PRIV) |
|---|---|---|---|---|---|---|---|
| FOOD | 01 | $300 | 1 | WEEKLY | $100 | JULY-AUG | ALL |
| SNACKS | 02 | $50 | 2 | MONTH | $50 | JULY-AUG | ALL |
| CLOTHING | 03 | $150 | 2 | MONTH | $500 | AUG | ALL |
| RESTAURANTS | 04 | $200 | 3 | MONTH | $300 | JULY | A |
| BOAT | 05 | $1000 | 3 | SEMI-ANNUAL | – | – | B |
| TRAVEL | 06 | $4000 | 2 | SEMI-ANNUAL | – | – | A, B |
| GIFTS | 09 | $50 | 2 | MONTH | $2000 | DEC | A, B |
| ENTERTAIN | 10 | $400 | 3 | MONTH | – | – | A |
| OVERALL | 00 | $2000 | – | ANYTIME | $2000 | DEC | |
| ALCOHOL | 11 | | BLOCKED | | | | NONE |

A65.  And "when the limit is reached," users can receive a notification.  A67 (1:66-2:11).  The notification can be performed via any means, such as "via a phone call, email or over an Internet connection."  A67 (2:1-6); *see also* A68 (3:55-63).

The claims disclose no specialized hardware or software for implementing the budgeting idea.  At issue here are independent claim 5 and dependent claims 6-11.  Claim 5 provides:

5. A method comprising:

storing, in a database, a profile keyed to a user identity and containing one or more user-selected categories to track transactions associated with said user identity, wherein individual user-selected categories include a user pre-set limit; and

causing communication, over a communication medium and to a receiving device, of transaction summary data in the database for at least one of the one or more user-selected categories, said transaction summary data containing said at least one user-selected category's user pre-set limit.

A71.

## 2.    '382 Patent (Customizing Web Pages)

The '382 patent relates to the basic idea of customizing web page content based on a user's personal information and browsing history.  A32-44.

The specification acknowledges that there was already a way for users to obtain tailored content—*i.e.*, by answering questions about themselves on a given web site, including "standard" questions like the "user's name, address and other personal or financial information."  A42 (3:16-21).  The specification explains that "several current Web pages permit a user to create a profile for that particular Web page" to collect the user's personal information, A42 (4:18-20), and that such a user "profile" is a "file having a plurality of fields which hold data" about the user.  A42 (3:53-55) (numbers omitted).  The specification admits that, "[u]ltimately" the user "will acquire the information they need," but that the process can be

"extremely frustrating and time consuming" because the profile cannot be reused at other web pages and the user must reenter the personal information each time. A42 (3:16-17, 3:35-36).

The patent's solution to this problem is to store the user's personal information and browsing history in a reusable profile and automatically provide tailored web content based on the profile. A42-43 (3:40-4:26, 6:18-38). However, beyond expressing that aspiration, the claims, including as construed by the district court, do not specify or require any specialized hardware or software for implementing that concept—at most they employ well-known general purpose computing components and functionality, including the Internet. *See* A44; A756-58.

At issue are independent claims 1, 16, and 21, and dependent claims 2-5, 17, 19-20, and 22. Claim 21 provides:

> 21. A method comprising:
>
> receiving data from a user profile associated with a user;
>
> in response to a request associated with the user, sending a data stream that is selected based at least in part on the received data from the user profile; and displaying the data stream via an interactive interface, the interactive interface comprising:
>
> a display depicting portions of a web site visited by the user as a function of web site navigation data; and

11

> a display depicting portions of a web site visited by
> the user based at least in part on the received data
> from the user profile.

A44. Claim 16, the other independent method claim, differs in relevant part only by adding a step for "storing" information about a user in a "user profile[]" and "transferring data from a specified user profile." *Id.* Claim 1, the only other independent claim, is couched as a system that performs a subset of the same method steps. *Id.*

### 3. '587 Patent (Organizing Images)

The '587 patent is directed to methods for organizing digital images. A74-114. The claims provide for organizing hard copy pictures into categories, scanning them into digital form, and storing the digital files by category. A104 (2:12-21). At issue are independent claims 1 and 18 and dependent claims 5-6 and 8. A113-14. Claim 1 provides:

> 1. A method of automatically organizing digital images
> obtained from a plurality of hard copy prints, each of said
> hard copy prints having an image thereon, comprising the
> steps of:
>
> *digitally scanning a plurality of hard copy prints* that
> have been grouped into one or more categories, each
> category *separated by an associated machine
> readable instruction* form as to obtain a digital file of
> each of said images and digitally associating said one
> or more categories with said digital images in
> accordance with said associated machine readable
> instruction form executed by a computer.

> storing said digital images files and associated
>   categories on a digital storage medium; and
>
> producing a product incorporating images from one or
>   more of said categories as requested by a customer.

A113 (emphasis added).

Claim 18 similarly contains a "digitally scanning . . ." phrase requiring that "each category [is] associated with an instruction form" and providing for "obtaining associated category information for said digital images in accordance with said machine readable instruction executed by a computer." A114.

### C.    District Court Proceedings

On June 19, 2013, IV sued Capital One alleging infringement of five patents. A1. On October 14, 2013, Capital One filed antitrust counterclaims alleging monopolization and attempted monopolization in violation of Section 2 of the Sherman Act, *see* A5026-35 ¶¶ 61-87 (Counterclaims Eleven and Twelve), and anticompetitive patent acquisitions in violation of Section 7 of the Clayton Act, *see* A5036-37 ¶¶ 88-94 (Counterclaim Thirteen).

### 1.   Dismissal Of Capital One's Antitrust Counterclaims Without Discovery

On December 5, 2013, the district court dismissed Capital One's antitrust claims with prejudice, without permitting any discovery or leave to amend.[2] A5412.  The court's rationale was that Capital One could not state a claim because it buys from, rather than competes with, IV, and that Capital One had not alleged sufficiently detailed facts.  It held that Capital One had not alleged a "'relevant market' under any recognized antitrust jurisprudence" because it did not allege "an 'area of effective competition' between IV and the commercial banks."  A5191; A5189.  The court thought that Capital One could not claim to be "locked-in" to IV's portfolio under cases like *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451 (1992), *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 315 (2007), and *Meredith Corp. v. SESAC, LLC*, 2011 U.S. Dist. LEXIS 24517 (S.D.N.Y. Mar. 9, 2011), because Capital One had alleged that much or all of IV's portfolio consisted of invalid patents.  A5190-91.

The court also held that Capital One's allegations concerning IV's pricing power were "conclusory," and failed to explain "why IV's alleged 'supracompetitive prices' reflect unlawful monopoly power within the context of

---

[2]   The evidence of IV's anticompetitive conduct summarized above did not feature in Capital One's antitrust counterclaims because IV did not produce its inculpatory documents until after the district court dismissed with prejudice.

IV's right to license its patents." A5192. The district court explained that it "does not understand[] how threats of litigation to enforce presumably valid patents can render unlawful license fees that would otherwise be lawful." *Id.* And it held that Capital One had not yet alleged a sufficient history of "sham litigation" to escape the *Noerr-Pennington* doctrine. A5194. Finally, the court held that Capital One failed to state a claim under Section 7 of the Clayton Act because, it thought, the anticompetitive effects occasioned by IV's patent-asset acquisitions derived solely from "conduct that post-dates the acquisition" of the patents, rather than from the acquisitions themselves. A5198.

## 2. Claim Construction

On December 18, 2013, the district court construed three disputed terms that are relevant here. A752-60. First, as to the budgeting claims (the '137 patent), the court determined that the "[s]toring" step should be given its ordinary meaning (A759), which does not specify any computer implementation, rather than IV's proposed construction of "storing, in a *computer-based* database, a *computerized* database record of parameters including user-created control information *identifiable by a computer* using a unique value associated with a  user identity." A750 (emphases added). Second, as to the web page customization claims (the '382 patent), the court determined that the "interactive interface" means "a selectively tailored medium by which a web site user communicates with a web

site information provider," essentially adopting IV's construction. A756. Third, as to the image organization methods (the '587 patent), the court construed the "digitally scanning . . ." phrases in claims 1 and 18 to mean "*[c]onverting hard copy prints into digital images* wherein said plurality of hard copy prints have been grouped together into one or more categories, each category being *associated with a machine readable instruction form scanned therewith* and executed by a computer." A760 (emphasis added) (brackets removed). The district court emphasized that its construction requires the "instruction form" to be a "hard copy form." *Id.*

### 3. Stipulated Judgment Of Non-Infringement Of '587 Patent Claims And Voluntary Dismissal Of Most Other Claims

In January 2014, based on the court's construction of the "digitally scanning . . ." phrases, IV stipulated to non-infringement of the '587 patent claims. A5415-20; A777-78. The court also granted IV's voluntary dismissal with prejudice regarding two other patents (not at issue in this appeal). A5415; A5421. And, in February 2014, IV voluntarily dropped most of the claims of the last two patents (the '137 and '382 patents). A5422-41; A5442-46.

### 4. Summary Judgment Of Invalidity Of All Remaining '137 And '382 Patent Claims

On April 16, 2014, the district court granted summary judgment to Capital One on the remaining asserted claims of the '137 patent (claims 5-11) and the '382

16

patent (claims 1-5, 16-17, and 19-22). The court held those claims invalid for lack of patent-eligible subject matter under 35 U.S.C. § 101. A780-85. The court recognized that, at root, both patents involve "mere manipulation or reorganization of data"—the '137 patent claims are directed to "monitoring expenditures according to preset limits" (*i.e.*, basic budgeting) and the '382 patent claims are directed to tailoring web site content to the individual users (*i.e.*, personalizing web pages). A785. The court held that, "however the claim terms may be construed," the claims add nothing inventive to those concepts because they simply describe implementing them using "conventional computer components" (such as a database) "operating in a conventional matter" (such as storing, manipulating and transmitting data). A784. "At most," the court explained, "the patents describe a more efficient system or method for performing tasks that could be done without a computer," but "there is no attempt in either patent to patent specific software that implements the described functions." A785; A784 n.7.

The court held that the '382 patent claims are also invalid for indefiniteness under 35 U.S.C. § 112(b). A785-91. The court determined that the term "interactive interface"—*i.e.*, "a selectively tailored medium by which a website user communicates with a web site information provider" (A756)—does not inform a skilled artisan of the bounds of the claim because nothing in the patent "provides any guidance on what the 'medium' is, how it is or even could be

17

'selectively tailored,' or how (if at all) the selective tailoring relates to communication between web site users and web site information providers." A787. Indeed, the court explained, IV's own experts "cannot say definitively what it is or is not." *Id.* The court declined to rule on the remaining grounds for summary judgment. A791 n.13.

On April 22, 2014, the district court entered final judgment disposing of all patent claims in favor of Capital One. A793. IV appealed and Capital One cross appealed.

## SUMMARY OF THE ARGUMENT

### *IV's Appeal*

The district court properly resolved the patent issues based on well-established principles of patent-eligibility, indefiniteness, and claim construction.

First, the district court correctly held that the asserted claims of the '137 and '382 patents are not directed to patent-eligible subject matter under 35 U.S.C. § 101. The Supreme Court has long held that "abstract ideas" are not patent-eligible. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014). A party cannot, for example, patent concepts such as using third-party intermediaries to mitigate settlement risk, underwriting commercial transactions on the Internet, or gathering and combining data. And that prohibition cannot be circumvented with the "draftsman's art" merely by expressing the idea as a series of routine

steps, implementing it using generic computer components and functions or embellishing it with other inconsequential features or field-of-use limitations. *Id* at 2357-60. The asserted claims here are directed to the abstract ideas of budgeting (the '137 patent) and personalizing a web page (the '382 patent) and, at most, recite generic computer implementation and append other inconsequential steps— precisely the same drafting efforts that courts have repeatedly rejected under § 101.

Second, the district court also correctly held that the '382 patent claims are indefinite under 35 U.S.C. § 112(b). The court determined that the term "interactive interface"—construed, at IV's request, as a "selectively tailored medium"—does not fairly apprise one of ordinary skill in the art of the claims' scope in light of the intrinsic record. As the court recognized, the patent does not explain what constitutes a "selectively tailored medium." And IV in its brief before this Court still cannot articulate a consistent and definite formulation.

Third, the district court correctly construed the '587 patent claims and entered a stipulated judgment of non-infringement based on that construction. It is black-letter law that a patent applicant limits claim scope by amending its claims during prosecution to overcome an examiner's rejection. Here, the applicants obtained the patent by amending the claims to make clear that the "instruction form" in the asserted claims is a hard copy. That prosecution history (which IV ignores) is dispositive, as the district court held.

**CONFIDENTIAL MATERIAL OMITTED**

The district court's judgment on the patent issues should be affirmed.

*Capital One's Cross-Appeal*

The antitrust issues, by contrast, are somewhat novel, because IV's business strategy is unprecedented. But the district court misunderstood the governing law and the very real antitrust concerns that an acquisition and licensing strategy like IV's raises.

Antitrust law has always scrutinized patent acquisitions to ensure that they do not bestow monopoly power on the buyer. IV is the largest patent aggregator in history. Targeting the banking industry, and using shell companies to mask its acquisitions, IV aggregated 3,500 financial-services patents. IV claims that banks cannot operate without buying a license to its portfolio for a nine-figure sum. By secretly laying claim to thousands of banking-process technologies, IV thus created a monopoly bottleneck to which it alone has licensing authority and to which no practical substitute exists. That is the *very definition* of monopolizing an antitrust market. Similarly, the defining hallmark of an anticompetitive business strategy is that it creates pricing power that did not previously exist, by means other than a superior product, business acumen, or historical accident. The patents in IV's portfolio had little, if any, licensing value before IV combined them, and IV specifically selected them for their [[          ]] and hold-up value rather than for their inherent technological value. Indeed, IV admits in documents produced after

**CONFIDENTIAL MATERIAL OMITTED**

the antitrust claims were dismissed that it [[

]] A5211.

The district court's conclusion that there is not even a *plausible* antitrust claim lurking in these facts rests on several errors of law that this Court should correct. There is no requirement that an antitrust plaintiff must compete with the defendant in the relevant market; customers, as well as competitors, may bring antitrust claims. Further, a cluster market comprised of the technologies that enable commercial banking processes is a perfectly plausible and conventional antitrust market. In any event, defining the precise contours of the relevant market is a factually complex exercise requiring discovery and expert testimony (made uniquely complex in this novel context), and not a proper subject for a with-prejudice 12(b)(6) dismissal on first pass. A strategy of patent acquisition and enforcement absolutely can be anticompetitive and unlawful under the antitrust laws even if the patents were valid and infringed (which is not the case here, as Capital One has shown). And, such as strategy can be even more anticompetitive when the patents are invalid or not infringed as the Supreme Court recently found in *Actavis*. Further, to state such a claim, a plaintiff need not prove, in advance, that all of the defendant's patents are invalid. Nor is a patent-acquisition strategy insulated from scrutiny under Section 7 merely because its anticompetitive

**CONFIDENTIAL MATERIAL OMITTED**

consequences depend on steps the acquirer plans to take after the acquisition using the acquired patent-assets.

There is *at least* a plausible antitrust claim here, which raises extremely important issues at the cutting edge of the law. And these important decisions should not be resolved on the pleadings—without any discovery. They should be decided after Capital One has an opportunity to develop the facts and explain the dynamics of the relevant market with expert testimony. For example, the limited discovery that IV was forced to provide in connection with the patent claims demonstrates that it was error to terminate the antitrust inquiry on the pleadings because IV admits, among other things, that it aggregates [[

]] A5211. Indeed, another court recently (and correctly) held that *very similar monopolization allegations against IV* require additional factual development and cannot be resolved on the pleadings. *Intellectual Ventures I LLC v. Symantec Corp.*, 2014 WL 4773954 (D. Del. Sept. 24, 2014).

The district court's dismissal of Capital One's antitrust counterclaims should be reversed.

# ARGUMENT

## *IV'S Appeal*

## I.   THE '137 AND '382 PATENT CLAIMS ARE INVALID UNDER § 101

Section 101 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."  35 U.S.C. § 101.  There is, however, an important exception for abstract ideas, which are patent-ineligible as a matter of law because they are basic tools in the "'storehouse of knowledge'" that are "'free to all . . . and reserved exclusively to none.'"  *Bilski v. Kappos*, 130 S. Ct. 3218, 3225 (2010) (citation omitted).  The Supreme Court's two-part framework for analyzing § 101 eligibility governs this appeal.  *Alice*, 134 S. Ct. at 2355.

Step one of the *Alice* framework asks whether the claims are directed to an abstract idea.  In *Alice*, the Supreme Court concluded that the claims "are drawn to the abstract idea of intermediated settlement."  *Id.* at 2352.  As the Court explained, the concept of "intermediated settlement," like the abstract idea of hedging risk in *Bilski*, is a "'fundamental economic practice.'"  *Id*. at 2356 (quoting *Bilski*).

Step two asks whether the claims "contain[] an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application."  *Id.* at

2357 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294, 1298 (2012)).  The prohibition on patenting abstract ideas cannot be circumvented through mere "'draftsman's art,'" or by trying to dress up an abstract idea with inconsequential steps or features.  *Id.* at 2359 (quoting *Parker v. Flook*, 437 U.S. 584, 593 (1978)).  Taking an abstract idea and adding "'well-understood,'" "'routine,'" or "'conventional'" activities or features "previously known to the industry" contributes nothing inventive.  *Id.* at 2359 (quoting *Mayo*). For example, simply implementing an abstract principle using well-known computer components or functions, limiting the idea to a particular field of use, or adding token extra-solution activity is insufficient.  *Id.* at 2357-59; *see also Gottschalk v. Benson*, 409 U.S. 63, 67-68 (1972).  Without meaningful limits to an abstract idea, a patent effectively preempts the idea itself and claims exclusive ownership over a range of inventions that the patentee never conceived, much less contributed to the state of the art.  *Alice*, 134 S. Ct. at 2354; *Bilski*, 130 S. Ct. at 3231; *O'Reilly v. Morse*, 56 U.S. (15 How.) 62, 112-14 (1854).

In *Alice*, although the claims purported to describe "a computerized scheme for mitigating 'settlement risk,'" 134 S. Ct. at 2352, the Court found that the patentee's method claims merely "require a generic computer to perform generic computer functions," and, as a whole, "simply recite the concept of intermediated settlement as performed by a generic computer."  *Id.* at 2359.  They do not, "for

example, purport to improve the functioning of the computer itself," or "effect an improvement in any other technology or technical field." *Id.* The computer system and computer readable medium claims failed for "substantially the same reasons." *Id.* at 2360. They "add[ed] nothing of substance to the underlying abstract idea." *Id.*

As in *Alice*, the asserted claims at issue here do not claim patent-eligible subject matter under § 101. The claims are directed to abstract ideas—the basic concepts of budgeting (the '137 patent) and customizing a web page based on a user's characteristics and browsing history (the '382 patent)—and they at most include the type of conventional steps and generic computer components that the Supreme Court and this Court have held does not make them patent-eligible.

IV's arguments are unpersuasive and largely stem from its misunderstanding of, or resistance to, the *Alice* framework. IV contends that the claims do not involve an underlying abstract idea unless they do "nothing more" than recite the abstract idea (Br. 22) and that, in any event, the claims add enough to be patent-eligible merely because they require a "'general purpose computer'" that must be "'programmed'" to perform the functions (Br. 29 (citation omitted)). *Alice* forecloses both arguments.

The district court correctly held the asserted claims invalid under § 101.

### A.    The '137 Patent Claims Are Not Patent-Eligible

### 1.    The Claims Are Directed To The Abstract Idea Of Budgeting

The asserted '137 patent claims (of which claim 5 is concededly representative) are directed to the abstract idea of budgeting—*i.e.*, self-imposing spending limits for different categories of expenditures and monitoring the expenditures.  A71 (cl. 5); *see* A780 n.1; Br. 30-38 (defending only claim 5); *see also Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1331 (Fed. Cir. 2012) (declining to "separately address" claims or arguments under § 101 that patentee does not "separately argue[] on appeal").

The claims involve the basic steps of (1) tracking and categorizing the user's expenditures and (2) notifying the user of his or her pre-set limit and total expenditures in at least one of the categories.  *See Dealertrack*, 674 F.3d at 1333 (examining claims in their "simplest form" to identify the "'basic concept'" at issue (quoting *Bilski*, 130 S. Ct. at 3231)).  But categorizing and monitoring expenditures against self-imposed limits is the essence of anyone setting a budget—what individuals, families, corporations, and governments have done for centuries.  *See*, *e.g*., John R. Bartizal, *Budget Principles and Procedure* 6-7 (1942); S. Agnes Donham, *Spending the Family Income* 98-102 (1933).  And third parties—whether spouses, accountants, CFOs, or the U.S. Office of Management and Budget—have long assisted in such efforts.  The budgeting notion embodied in

the asserted claims is a basic economic tool that is not patent-eligible.  *See Alice*, 134 S. Ct. at 2354; *Bilski*, 130 S. Ct. at 3225.  Indeed, IV itself concedes that the claims involve budgeting and that budgeting is "undoubtedly . . . an abstract concept."  Br. 31.

The concept of budgeting is akin to—but even more abstract than—the ideas underlying claims previously held invalid by the Supreme Court.  For example, the Supreme Court found abstract the concept of using a third-party intermediary to prohibit or enable transactions depending on whether the parties have sufficient assets (in *Alice*), and the concept of engaging in a transaction to hedge against risk (in *Bilski*), whereas the budgeting method here merely tracks and provides *information* about a user's expenditures and pre-set spending limit.  And the Supreme Court found abstract an algorithm for monitoring and updating alarm limits during catalytic conversion in the petrochemical industry (in *Flook*), and an algorithm for converting numbers from binary coded decimal form (in *Benson*), whereas the method here does not specify any particular algorithm for monitoring the user's expenditures or updating the pre-set spending limit.

Likewise, this Court has held abstract computer-based claims for underwriting online transactions (*buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014)), generating tasks in an insurance organization (*Accenture Global Servs. v. Guidewire Software, Inc.*, 728 F.3d 1336, 1346 (Fed. Cir. 2013),

*cert. denied*, 134 S. Ct. 2871 (2014)), managing a stable value protected life insurance policy (*Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1278, 1280 (Fed. Cir. 2012), *cert. denied*, 134 S. Ct. 2870 (2014)), processing car loan applications through a clearinghouse (*Dealertrack*, 674 F.3d at 1333), managing real estate investments for tax deferred exchanges (*Fort Props., Inc. v. Am. Master Lease LLC*, 671 F.3d 1317, 1323 (Fed. Cir. 2012)), and detecting whether an Internet credit card transaction is fraudulent (*CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1375 (Fed. Cir. 2011)).  In each of those cases, the Court recognized that, although broken into a series of steps or components (often embellished with numerous specific hardware and software components), the underlying ideas were nonetheless abstract concepts and mental processes.  The underlying budgeting idea in the '137 patent is even more abstract.

### 2.    The Claims Add Nothing Inventive To The Abstract Budgeting Idea

The '137 patent claims contain no "'additional features,'" or any "'inventive concept,'" "sufficient to 'transform' the claimed abstract idea into a patent-eligible application."  *Alice*, 134 S. Ct. at 2357.  The claims provide for storing "in a database" a user "profile"—which is "keyed to" (or associated with) the user's identity—to track the user's expenditures within the user's defined categories (such as food, clothing, travel, and so on) and "communicat[ing]" over a communication medium" to a "receiving device" the "data" summarizing the

28

user's expenditures in one of the categories and noting the user's pre-set spending limit in that category.  A71 (cl. 5).

However, those are routine steps that can be performed by someone with a pad of paper and a telephone.  A "database" can be as simple as a spreadsheet or deck of index cards.  *See* A253 (database is any "collection of data"); A261 (same).  A user's "profile" can be "stored" in the database by tallying the user's expenditures in each spending category and keeping track of the user's pre-set spending limits.  For example, the specification describes Figure 5 as showing "profile data bases on a category by category basis."  A68 (3:35-36); A70 (8:42-54).  And it can be "keyed" to a user's identity by, for example, writing the user's name and social security number at the top.  Further, as the specification explains, the tally can be "communicat[ed] over a communication medium" in "any number of ways" such as "*via a phone call*, email or over an Internet connection."  A71 (10:42); A67 (2:4-6, 47-48) (emphasis added).  Taking the claim steps separately or "in ordered combination," as the Court did in *Alice*, they add nothing inventive and do little more than "instruct the practitioner to implement the abstract idea" of budgeting and are, therefore, patent-ineligible under § 101.  134 S. Ct. at 2359; *see also Mayo*, 132 S. Ct. at 1294-1301.

IV contends that the claims require computer implementation because the "storing" step should be construed as "'[s]toring, in a *computer-based* database, a

*computerized* database record of parameters including user-created control information *identifiable by a computer* using a unique value associated with a user identi[t]y.'" Br. 36 (quoting A750) (emphases added). IV relies on the fact that "[e]ach and every embodiment is implemented by one or more computers." *Id.* However, the district court correctly rejected that argument, holding that the claims at issue here maintain their plain and ordinary meaning. A759. IV points to nothing in the intrinsic evidence that clearly and unequivocally limits the plain claim language—and it is black-letter law that it is "'not enough that the only embodiments, or all of the embodiments, contain a particular limitation' to limit a claim term beyond its ordinary meaning." *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) (citation omitted).

But even if the claims were interpreted to require computer implementation, as IV proposes, they are still ineligible. It does not matter that, as construed by IV, the claims provide for "storing" data in a "computer-based database," "electronically tracking transactions," and "automatically notifying a customer of transactions" "on-the-fly." Br. 30-38; *see* A750. Those are precisely the sort of general-purpose computer components and functionality that the Supreme Court found insufficient in *Alice*, *Flook*, and *Benson*.

In *Alice*, for example, the Court held storing data in a database is "one of the most basic functions of a computer" and that "[t]he same is true with respect to the

30

use of a computer to obtain data," "track[] multiple transactions," "adjust account balances," and "issue automated instructions" "simultaneously." 134 S. Ct. at 2359. "[A]ll of these computer functions are 'well-understood, routine, conventional activit[ies]' previously known to the industry." *Id.* (quoting *Mayo*, 132 S. Ct. at 1294). And the Court held that reciting components such as "a 'data processing system' with a 'communications controller' and 'data storage unit'" provides no "meaningful limitation beyond generally linking the use of the method to a particular technological environment." *Id.* at 2359-60 (internal quotation marks and citation omitted); *see also Flook*, 437 U.S. at 590; *Benson*, 409 U.S. at 68.

The computer functions and components here are strikingly similar and equally conventional. The user's "profile" and transaction data are stored in a computer database, the data is adjusted as transactions are entered, and the user is automatically notified. As in *Alice*, "each step does no more than require a generic computer to perform generic computer functions" and, as a whole, simply follow from the underlying idea of budgeting. 134 S. Ct. at 2359. The claims "do not . . . purport to improve the functioning of the computer itself,[] [n]or do they effect an improvement in any other technology or technical field." *Id.* Even accepting IV's constructions, therefore, the claims "amount to 'nothing significantly more' than an instruction to apply the abstract idea . . . using some unspecified, generic

computer" components—which is "not 'enough' to transform [the] abstract idea into a patent-eligible invention." *Id.* at 2360.

Contrary to IV's argument (at 32), *Diamond v. Diehr*, 450 U.S. 175 (1981), could scarcely be further removed from this case. *Diehr* did not involve an attempt to patent a basic economic principle or mental process, but, as recognized in *Alice*, "used [an] equation in a process designed to solve a technological problem in 'conventional industry practice.'" 134 S. Ct. at 2358 (quoting *Diehr*). In addition to the equation, the invention in *Diehr* used, among other things, "a 'thermocouple' to record constant temperature measurements inside the rubber mold—something 'the industry ha[d] not been able to obtain'" and transformed the rubber into a different state or thing. *Id.* (quoting *Diehr*). By contrast, the '137 patent does not "use [an] equation . . . to solve a technical problem," *id.*, or "transform[] or reduc[e] an article to a different state or thing," *Diehr*, 450 U.S. at 192. Rather, the '137 patent simply takes the fundamental economic concept of budgeting, breaks it into its basic steps, and offers the unremarkable and conventional observation that the fundamental concept may be deployed using a general purpose computer (without saying how, much less specifying any particular programming). *Alice* is dispositive: the claims are not patent eligible.

This Court's recent precedent compels the same result, rejecting as patent-ineligible claims with implementation details and hardware components that were

far more specific than those in the '137 patent claims.  For example, the claims in *Accenture* were directed to a computer system for generating tasks to be performed in an insurance organization by "storing" transaction information in "an insurance transaction database," using "software" to determine what tasks ("stor[ed]" in a "task library database") need to be accomplished for those transactions, and assigning the tasks to authorized individuals.  728 F.3d at 1338.  Although the claims recited multiple software and hardware components—including a server, several databases, an "event processor," a "task engine," a "task assistant," and a "client component" that "transmits and receives data"—this Court held them patent-ineligible because they were merely "generic computer components" and "generalized software components arranged to implement an abstract concept."  *Id.* at 1343-45.

Similarly, the claims in *Bancorp* for managing a life insurance policy were ineligible—even though "[t]he[ir] plain language . . . require[d] particular computing devices, such as a 'generator,' a 'calculator,' and 'digital storage'"— because appending such general components could not "salvage an otherwise patent-ineligible process."  687 F.3d at 1274, 1278.  It is not enough, the Court emphasized, that a computer, programmed in some unspecified way, might be able to do the tasks "'more quickly.'"  *Id.* at 1278 (citation omitted); *see also*, *e.g.*,

*Dealertrack*, 674 F.3d at 1333; *Fort Props.*, 671 F.3d at 1322-24; *CyberSource*, 654 F.3d at 1373-74.

In all of those cases, the computing devices did not meaningfully limit the claims because either (i) the claims did not "specify how the computer hardware and database are specially programmed to perform the steps claimed" and the computer could be programmed to perform them in different ways (*see, e.g.*, *Dealertrack*, 674 F.3d at 1333); or (ii) the claims despite claiming computer components fundamentally did not need a computer at all (*see, e.g.*, *CyberSource*, 654 F.3d at 1373). Here, the general purpose computing devices and functions do not meaningfully limit the claims for both of those reasons.

First, the claims here require even more generic computer hardware or programming than the claims in the cases discussed. Each of the steps and features, even under IV's (improper) construction, are the same type of routine computer components (databases and processors) and functions (storing, organizing, and transmitting data) that this Court has repeatedly found do not confer patent-eligibility. *See, e.g.*, *Accenture*, 728 F.3d at 1338, 1343-45 (using "software" and a "database" to "stor[e]," "transmit[]," and "receiv[e]" data). As this Court has explained, "gathering and combining data" (*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014)), "manipulation or reorganization of data" (*CyberSource*, 654 F.3d at 1375), and

34

"using categories to organize, store, and transmit information" (*Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 988, 991-92 (Fed. Cir. 2014)) are all "well-established" activities that do not make claims patent-eligible. Further, contrary to IV's suggestion (at 36), calling the stored user data a "profile" adds nothing inventive, just as, for example, the "device profile" in *Digitech* and the "shadow record" in *Alice* did not make the claims patent-eligible in those cases. Nor can IV rely on the specification to fill in the missing details because "the important inquiry for a § 101 analysis is to look to the claim[s]" and "the complexity of the implementing software or the level of detail in the specification does not transform a claim reciting only an abstract concept into a patent-eligible system or method." *Accenture*, 728 F.3d at 1345.

Second, the underlying budgeting concept can be—and long has been—performed entirely by humans, without a computer at all. *Supra* at 26-27, 29; *see CyberSource*, 654 F.3d at 1373 (underlying abstract idea performable by humans despite computer implementation). Simply using computers to perform that otherwise patent-ineligible idea more quickly or efficiently—*i.e.*, "automat[ing]" it as IV contends (at 30, 31, 32, 33, 35, 37)—does not make it patent-eligible. *See Bancorp*, 687 F.3d at 1278; *Dealertrack*, 674 F.3d at 1333.

Therefore, as IV cannot identify anything inventive in its claims (and does not purport to separately defend its dependent claims), the asserted '137 patent claims are invalid.

### B.    The '382 Patent Claims Are Not Patent-Eligible

#### 1.    The Claims Are Directed To The Abstract Idea Of Customizing A Web Page

The asserted '382 patent claims are directed to the abstract idea of tailoring a web page based on a user's personal information (such as gender, age, and address) and browsing history.  Each of the claims (of which independent claims 1, 16, and 21 are concededly representative) includes some or all of the basic steps of (1) receiving, storing, and transferring user data (called user "profiles") and (2) providing customized content over the Internet to "depict[] portions of a web site" based on the user's profile and user's "web site navigation data."  A44 (cl. 1, 16, 21); *see also* A757 ("web site navigation data" means "[d]ata representing portions of the website visited by the user"); Br. 22-30 (not separately relying on dependent claims).  IV's own description of the claims confirms that they are directed to the abstract idea of web page customization—the notion that "rather than . . . a one-size-fits-all web site display with static content, each user's display could be specifically tailored based on that user's profile and website navigation data."  Br. 5.  Therefore, under step one of the *Alice* framework, the asserted claims involve a patent-ineligible abstract idea, just as in the cases discussed.  *See*,

*e.g.*, *Flook*, 437 U.S. at 589-90 (updating alarm values); *Digitech*, 758 F.3d at 1351 ("gathering and combining data"); *Dealertrack*, 674 F.3d at 1333 (selectively forwarding an applicant's loan information); *supra* at 27-28.

IV contends that the idea is neither "broad" enough nor "age-old" enough to be abstract. Br. 22, 23. The Supreme Court has rejected both arguments. In *Mayo*, the Court explained that abstract ideas are not patent-eligible even if they are "narrow" and "have limited applications." 132 S. Ct. at 1302. And, in *Flook*, the Court held that computer implemented claims were directed to a patent-ineligible formula even "*assum[ing] that [the] formula is novel* . . . and that [the patent applicant] discovered it." 437 U.S. at 588 (emphasis added). Recently, in holding ineligible claims for underwriting online transactions, this Court reiterated that "abstract ideas" are patent-ineligible "*even if* the particular . . . abstract idea at issue is narrow" and "*no matter how '[g]roundbreaking*, innovative, or even brilliant.'" *buySAFE*, 765 F.3d at 1352-53 (emphasis added) (citation omitted).

In any event, the idea here *is* broad and rooted in age-old principles. The abstract idea of tailoring content on a web page applies to anyone tailoring content to individual users on the Internet in *any* context (economic, social, political, or otherwise). In that respect, the claims here tie up a basic idea across an even broader spectrum of applications than relatively confined notions such as intermediated settlement (*Alice*), hedging risk in the energy market (*Bilski*), and the

other concepts discussed. *Supra* at 27-28. The idea is a variation on the long-established abstract concept of tailoring media content, such as when periodicals produce different print versions based on readers' geographical regions or when political campaigns tailor mailings based on recipients' donation histories or party affiliations. At most, limiting that idea to a medium (the Internet) and certain targeted characteristics (a user's personal data and browsing history) are mere field of use limitations that do not make the idea any less abstract—just as it was not enough to limit the abstract hedging principle in *Bilski* to the energy markets (130 S. Ct. at 3231) or limit the abstract clearinghouse concept in *Dealertrack* to auto loan applications (674 F.3d at 1334).

### 2. The Claims Add Nothing Significant To The Abstract Web Page-Customization Idea

The '382 patent claims contain no additional features or inventive concept sufficient to transform the abstract idea into a patent-eligible application. *See* A44 (cl. 1, 16, 21). Contrary to IV's argument (at 24-25), the functions of receiving, storing, and transferring the user's data (in a user "profile") are conventional, not inventive. As discussed, those are "the most basic functions of a computer." *Alice*, 134 S. Ct. at 2359; *see also*, *e.g.*, *Accenture*, 728 F.3d at 1338, 1343-45 ("storing," "transmit[ing] and receive[ing] data" is non-inventive); *supra* at 30-35.

Providing web site content over the Internet—and even customizing the content based on the user's characteristics and "profiles"—is also a "'well-

understood, routine, conventional activit[y]' previously known to the industry." *Alice*, 134 S. Ct. at 2359.  As the specification explains, it was well established that users can receive tailored web content by entering personal data (in a "profile") such as "name, address and other personal or financial information"; indeed, "several current Web pages permit a user to create a profile for that particular Web page."  A42 (3:13-21, 4:18-20).  But, the specification explains, the need to repeat that process for each web site can be "frustrating and time consuming," so the patent merely purports to make it easier and faster (by reusing profiles across websites).  A42 (3:16-17); A43 (4:19).  However, asserting that a computer can perform the same tasks "'more quickly'" without claiming any special purpose programming or hardware does not make the claims patent-eligible.  *Bancorp*, 687 F.3d at 1278 (citation omitted); *Dealertrack*, 674 F.3d at 1333 (citation omitted).  And "receiv[ing] and send[ing] . . . information over [the Internet]" "is not even arguably inventive."  *buySAFE*, 765 F.3d at 1355.

IV argues that the "inventive concept" in these claims is "delivering customized web page content through an interactive interface as a function of navigation history and user characteristics."  Br. 27.  But that simply restates the abstract idea itself.  And the "interactive interface," which the district court construed as "a selectively tailored medium by which a web site user communicates with a web site information provider" (A756), is just a functional

description of a component that is necessary to performing the abstract idea (*i.e.*, the vehicle by which the web site operator delivers the tailored content to the user). The claims give no insight *how* to program or configure the "interactive interface" to "achieve[]" the patent's aspiration.  Br. 27.

IV also contends that the claims require "specific algorithms"—"a series of automatic and advanced computer instructions to intelligently decide what content should be presented based on the profile"—and repeatedly asserts that the claims describe a "special purpose computer" and "specific system."  Br. 8, 29.  But the claims nowhere describe what those "specific algorithms" or "computer instructions" are or how they "intelligently decide" on the content or otherwise disclose any specialized programming or hardware for implementing the abstract web page customization idea.   The claims here include no more "advanced, specific technology" (Br. 29) than the ones rejected in *Alice*, *Accenture*, and other cases.  *Supra* at 30-35.

As a last ditch effort, IV asserts that the claims are inventive because "only websites that are personalized based upon user characteristics *and* navigation history are covered."  Br. 25-26.  However, singling out two kinds of user data is, at most, another field of use limitation.  *See supra* at 38.  Similarly, the "device profile" claims in *Digitech* were abstract even though they specified and combined two types of data about a printing device (color and spatial properties).

As in *Alice* and the other cases discussed, the asserted '382 patent claims as a whole add nothing inventive to the underlying abstract idea of tailoring media content on a web page and do not improve "the functioning of the computer itself" or "any other technology or technical field."  134 S. Ct. at 2359.  Nor does framing one of the independent claims (claim 1) as a "system" make it patent-eligible.  *Id.* at 2360.  As IV cannot identify anything inventive (and has not even separately defended its dependent claims), all of the asserted claims are invalid under § 101.  *See id.* at 2359-60; *Dealertrack*, 674 F.3d at 1331.

### C.     IV Misunderstands *Alice*'s Two-Step Analytical Framework

The rest of IV's attempts to salvage the '137 and '382 patents stem from its misunderstanding of the *Alice* framework.  At step one, IV principally argues that the claims can involve an abstract idea only if they claim "nothing more" than the abstract idea itself and preempt "all ways" of performing the idea.  Br. 22, 24; *see* Br. 22-26, 30-33.  For example, IV contends that the claims do not implicate abstract ideas because they are "electronically" implemented (the '137 patent) or they "use[] the medium of the Internet" (the '382 patent) or they involve additional limitations, such as the functions of receiving and storing user data in a "profile" (both patents).  Br. 31, 23, 24-25.  IV charges Capital One with "ignor[ing] the[se] claim limitations" in assessing whether the claims involve an abstract idea.  Br. 25. *Alice* and like cases refute that critique.  Step one asks only whether the *underlying*

idea is abstract, while step *two* asks whether the claims' *additional* limitations are sufficient to convert the abstract idea into a patent-eligible application.  In *Alice* and *Bilski*, the claims involved an abstract idea even though they had additional limitations—computer implementation and random analysis algorithms, respectively.  *See also Flook*, 437 U.S. at 589-90 (underlying idea is abstract idea even though claims "d[id] not seek to 'wholly preempt'" it).

At step two, IV's argument is, in essence, that its claims are inventive because they are implemented on a computer.  IV contends that the claims become patent-eligible because they require "advanced, specific technology" (Br. 29) or "[j]ust by using the medium of the Internet" (Br. 23), even though the claims do not explain *how* they are implemented or *what* specific technology is required.  IV argues even more starkly that "'a general purpose computer in effect becomes a [patent-eligible] special purpose computer once it is programmed to perform particular functions pursuant to instructions from program software'"  Br. 29 (quoting *In re Alappat*, 33 F.3d 1526, 1545 (Fed. Cir. 1994)); Br. 36 (same).  But the Supreme Court soundly repudiated that theory in *Alice*, holding that merely claiming a "generic computer" programmed to perform an abstract idea does *not* result in a patent-eligible application of the idea.  134 S. Ct. at 2352; *see also buySAFE*, 765 F.3d at 1355 (implementing abstract idea on the Internet "is not even arguably inventive").

Under *Alice*'s governing framework, properly understood, IV's claims are directed to abstract ideas and add nothing inventive and, therefore, are ineligible under § 101. The district court's judgment should be affirmed.

## II.    THE '382 PATENT CLAIMS ARE INDEFINITE UNDER § 112(b)

The '382 patent claims are also invalid because, as the district court held, they are indefinite under 35 U.S.C. § 112(b). The court considered the term "interactive interface" in light of the intrinsic record and concluded, at IV's urging, that it refers to a "selectively tailored medium." A756. The court then evaluated whether the term, in that same context, fairly apprised skilled artisans of the claims' scope under § 112(b) and correctly concluded that it does not. A786-90.

Contrary to IV's arguments, neither the patent nor IV articulates a definite and consistent position on what constitutes a "selectively tailored medium." IV also contends that the district court improperly construed the claims before conducting the definiteness inquiry (a position foreclosed by the Supreme Court's recent decision in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014)), and improperly adopted IV's claim construction (a position foreclosed by basic principles of judicial estoppel and invited error). This Court should affirm the district court's judgment.

## A.    The District Court Properly Found The Claims Indefinite

Under § 112(b), a patent specification must "conclude with one or more claims *particularly pointing out and distinctly claiming* the subject matter which the [applicant] regards as the invention." 35 U.S.C. § 112(b) (emphasis added). A claim is invalid for indefiniteness if, when read in light of the specification and prosecution history, it does not inform one skilled in the art about the scope of the invention with reasonable certainty. *Nautilus*, 134 S. Ct. at 2129. To be sufficiently definite, "[t]he claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, --- F.3d ---, 2014 WL 4435871, at *5 (Fed. Cir. Sept. 10, 2014) (applying *Nautilus*). This requirement serves a critical "public-notice function" and wards off an "innovation-discouraging 'zone of uncertainty.'" *Nautilus*, 134 S. Ct. at 2130.

The term "interactive interface," as used in the context of the '382 patent's disclosure and construed by the district court to mean "a selectively tailored medium by which a website user communicates with a web site information provider" (A756), fails this test. The specification identifies vague labels associated with an "interactive interface" or "interface," such as "selectively tailored" and "medium," but never drills further to identify to one skilled in the art what structures, components, and specific functionality those labels actually

encompass. *See*, *e.g.*, A41-42 (1:54-2:18, 3:40-49). There are no objective boundaries: nothing in the '382 patent informs those skilled in the art what the "interactive interface" is, what it must include, or what it cannot include.

This ambiguity is illustrated most dramatically by the fact that neither IV's expert nor IV itself could (or can) identify consistently what an interactive interface is, or what it encompasses. *See* A787 (observing that IV's experts "cannot say definitively what it is or is not"). For example, IV's expert testified that the "interactive interface" includes three things: "the storage means to retain the information about the navigation data"; "the storage means to retain the information about the . . . user's personal characteristics"; and "the web page manager." A5590 (97:9-16). But he also testified that it could include several other things, including a web browser, the user's computer or display monitor, or even a computer network or a telephone system. *Id.* (97:24-99:7).

Similarly, IV identified "interactive interface" variously as including "an application on a web server," "a computer-readable media for storing computer software," "database structures," "computer software," and "selectively tailored software." A5514-16; *see also*, *e.g.*, A5450, A5459-61. And IV's arguments on appeal confirm both the term's ambiguity and the mischief that this ambiguity invites. At times, IV asserts that the "interactive interface" is the *infrastructure* for delivering selectively tailored content to a user: "It is the software and web server

that select and deliver customized web page content based on an individual user's personal characteristics and website navigation data." Br. 39. But, elsewhere IV contends that the "interactive interface" is the *content* itself: "The '382 patent is about selectively tailoring the medium—*i.e.*, the content to create a website—to an individual user." Br. 47.

The fact is that the '382 patent never explains to one skilled in the art what a "selectively tailored medium" is, what the medium contains, how and by what mechanism that medium would be "selectively tailored," or the like. A skilled practitioner would struggle to determine what structures, devices, "software," or other components, alone or in combination, might (or might not) be an "interactive interface." Consequently, the "interactive interface" fails to provide any measure of certainty—let alone "reasonable certainty"—of the claims' scope, permitting the claims to be molded and remolded like a nose of wax when applied in litigation. As such, "interactive interface" is indefinite and the claims are invalid. *See Nautilus*, 134 S. Ct. at 2129.

## B.    IV's Complaints About The Process Are Unfounded

IV argues on three interrelated procedural grounds that the district court erred by adopting IV's construction of "interactive interface" and then later finding the term indefinite. IV is wrong on all three.

First, IV argues that the indefiniteness analysis must be conducted in a *single* step—not *after* claim construction. *Nautilus* refutes IV's position. As the Supreme Court made clear, indefiniteness, like claim construction, is evaluated from the perspective of one skilled in the relevant art, at the time the patent was filed, and measures how the claim language would have been understood in light of the patent's specification and prosecution history. 134 S. Ct. at 2128. In any indefiniteness analysis, a court must attempt to ascertain the meaning of the claim term in view of the patent's disclosure. Therefore, it makes perfect sense to construe the claims and then assess indefiniteness. Indeed, that was precisely the posture in *Nautilus* and it is equally proper here. *See also*, *e.g.*, *H-W Tech., L.C. v. Overstock.com, Inc*., 758 F.3d 1329, 1331, 1336 (Fed. Cir. 2014) (finding claims indefinite after construing claims and emphasizing that "the construction of the disputed terms affects the invalidity analysis").

Second, in a revealing moment, IV also suggests that the district court somehow tricked IV into believing that it had escaped indefiniteness and unfairly denied IV the opportunity to swap its construction for some other, undisclosed, position about what the claim language means. Br. 41-42. However, IV's results-oriented assertion of prejudice is not supported by law or logic. If anything, the district court's properly staged approach provided a *greater* opportunity for IV to advocate its positions. IV had a full and fair opportunity to factor in Capital One's

47

indefiniteness arguments *at the claim construction stage*. But IV thumbed its nose at indefiniteness: "Capital One complains that 'advanced,' 'selectively tailored,' and 'medium' are ambiguous. As described above, these are the terms chosen by the patentee." A538. True enough, but where (as here) the patentee's chosen language deprives those skilled in the art of reasonable certainty about the claims' scope they are indefinite.

Third, IV argues that the district court should have *sua sponte* construed the term differently to preserve the claims' validity. Br. 41. However, it is well-established (and reiterated by the cases IV cites) that, where the intrinsic evidence compels a construction, the Court must adopt that construction and let the invalidity chips fall where they may. For example, in *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999), this Court "admonished against judicial rewriting of claims to preserve validity" and stated that "if the only claim construction that is consistent with the claim's language and the written description renders the claim invalid, then . . . the claim is simply invalid." *See also Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1367 (Fed. Cir. 2002). That is precisely what happened here. IV insisted that the intrinsic evidence compelled the district court to adopt IV's construction, and the district court agreed. That the labels attributed by the intrinsic evidence (and by IV) to

48

"interactive interface" render the claims indefinite is no basis to conjure a different construction.

In any event, IV cannot now complain that the district court committed error by adopting IV's own construction because basic principles of "estoppel, waiver, invited error, or the like . . . prohibit [IV] from asserting as 'error' a position that it had advocated at the trial." *Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 715 (Fed. Cir. 1998). Indeed, this Court "look[s] with 'extreme disfavor' on appeals that allege error in claim constructions that were advocated below by the very party now challenging them." *N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1290 (Fed. Cir. 2000); *see also Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1346 (Fed. Cir. 2001) ("[A] party will be judicially estopped from asserting a position on appeal that is inconsistent with a position it advocated at trial and persuaded the trial court to adopt.").

None of IV's procedural complaints changes the conclusion that the claims are indefinite. *Supra* at 44-46. The district court's judgment should be affirmed.

## III.    THE DISTRICT COURT PROPERLY CONSTRUED THE DISPUTED TERM OF THE '587 PATENT

IV argues that the district court erred in holding that the "instruction form" in the asserted '587 patent claims is a "hard copy" that is "scanned." Br. 49-52. However, as the district court recognized, the applicants for the '587 patent amended their claims to overcome an examiner's rejection and represented to the

examiner unequivocally that the amended claim language requires the "physical step" of "scanning" the "instructions"—a textbook example of claim scope disclaimer. A468. But IV does not even mention that crucial, and decisive, prosecution history. The district court's construction is sound and this Court should affirm the stipulated judgment of non-infringement based on that construction.

### A.    IV Has Forfeited Its Challenge To The District Court's Non-Infringement Judgment

As a preliminary matter, IV argues (remarkably) that the district court's claim construction did not actually require hard copy instruction forms at all and, therefore, that "no change in construction is required." Br. 51. IV cannot take back its stipulation. In the district court, IV "stipulate[d] that, under the Court's construction" there is no infringement of the '587 patent. A762. IV only reserved its right "to challenge the Court's claim construction" and to reassert the '587 claims if this Court "reverse[s] or modif[ies] those claim construction rulings." A762. Therefore, since IV now concedes that "no change in construction is required," this Court should hold IV to its stipulation and this Court need not consider the district court's claim construction. The district court's stipulated judgment of non-infringement should be affirmed.

**B.  The District Court Correctly Held IV To The Patent Applicants' Representations To The Patent Examiner**

On the merits, IV's claim scope position fares no better.  Claim terms "are generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citation and internal quotation marks omitted).  However, "when the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered" and the public is entitled to rely on that disclaimer.  *Biogen Idec, Inc. v. Glaxosmithkline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013).  At the same time, "applicants rarely submit affirmative disclaimers along the lines of 'I hereby disclaim the following . . .' during prosecution and need not do so to meet the applicable standard." *Saffran v. Johnson & Johnson*, 712 F.3d 549, 559 (Fed. Cir. 2013); *see also*, *e.g.*, *Uship Intellectual Props., LLC v. United States*, 714 F.3d 1311, 1315 (Fed. Cir. 2013) ("Our cases broadly state that an applicant's statements to the PTO characterizing its invention may give rise to a prosecution disclaimer.").

The prosecution history is decisive here.  During prosecution of the '587 patent, the examiner rejected claims 1 and 18 under § 101 as non-patentable subject matter because, under the then-prevailing test, the claims did not produce a "'useful, concrete, and tangible result.'"  A460 (emphasis omitted).  The previous

51

language of claim 1 provided for "digitally scanning said one or more categories and said associated machine readable instruction form to create one or more digitized image categories and associated digitized category data, respectively." A450. The examiner stated, among other things, that the language is "confusi[ng]": "How is it possible to digitally scan 'categories'[?]" A460.

The applicants responded by amending the claims to include language requiring "*scanning* a plurality of hard copy prints that have been grouped into one or more categories, each category separated by an associated *machine readable form*" (claim 1), A464 (emphasis added), and "*scanning* a plurality of hard copy prints" that "have been grouped together into one or more categories, each category associated with an *instruction form*" (later referenced as "said machine readable instruction") (claim 18), A113-14 (emphasis added).

The applicants explained how this language, in their view, satisfied § 101:

> Claim 1 clearly provides steps for *obtaining of digital images <u>and instructions</u> by digitally scanning*, *clearly a physical step*, from hard copy prints. The specification clearly discloses *scanning by a scanner*. . . . Applicant respectfully submits claim 1 as amended overcomes the rejection under 35 U.S.C. 101. Similar type changes have been made to claim 18 and therefore overcomes the rejection set forth by the Examiner.

A468 (citations omitted) (emphasis added).

In this statement to the examiner, the applicants clearly and unmistakably conveyed to those skilled in the art that claim 1 requires "obtaining of digital

images and instructions by digitally scanning," and stated that this claim element is "a physical step," thus disclaiming other ways to obtain digital images and instructions and disclaiming non-physical steps. And the same is true for claim 18, as the applicants "provided 'clear notice of th[e] linkage' between claim 1 and claim [18]" and "made no separate patentability argument for claim [18]." *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1373 (Fed. Cir. 2005). Therefore, as the district court correctly held, the "instruction form" in both claims is a "hard copy form" that is "scanned." A760.

This Court has found disclaimers in similar circumstances. For example, in *Uship*, the Court found a disclaimer where the applicant represented to the examiner that each step in the method must be performed by an automated shipping machine even though that limitation was not "'specifically recit[ed] at each step'" and, in response, the examiner allowed the claims. 714 F.3d at 1315-16. Similarly, *Saffran* held that the applicant unequivocally gave an "affirmative definition" by limiting the term "device" to a "sheet." 712 F.3d at 559; *see also Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004) ("We cannot construe the claims to cover subject matter broader than that which the patentee itself regarded as comprising its inventions and represented to the PTO."). There is likewise a clear disclaimer here.

53

### C.     IV's Perfunctory Challenge To The District Court's Construction Is Baseless

IV ignores the prosecution history entirely and offers no explanation why the applicants' representations to the examiner are not binding.  Br. 49-52.  Instead, IV relies entirely on the specification, arguing that the district court's construction reads out preferred embodiments.  This argument fails for several reasons.

First, most significantly, the specification discloses no embodiments in which a form, other than a hard copy form, is used to provide instructions from the user to the system about how scanned prints are to be organized.  Most of the forms IV points to are for other purposes—such as a form with instructions *to* the user, *see* A106 (5:61-6:4) ("a customer instruction sheet (form)"), or a product order form, *see* A109 (12:14-23); A110 (13:23-24).  Second, even if such disclosed embodiments existed, the applicants clearly and unmistakably represented to the patent office that their amendments limited the scope of the claims.  *See*, *e.g*., *N. Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1346 (Fed. Cir. 2005) (construction properly "exclude[d] a preferred embodiment" because "the prosecution history compel[led] such a result").  Third, two of IV's citations actually *support* the prosecution disclaimer that the instructions are digitally scanned—one discloses an HTML form for ordering *hard copy machine readable forms*, *see* A106 (5:35-40), and the other describes a software program providing

users with "instructions [that] will be in a format that can be scanned," *see* A106 (6:45-49).

The applicants' representations to the examiner are, therefore, fully *consistent with*, not contrary to, the patent's disclosure. The district court correctly held IV to those representations and construed the terms to mean that the "instruction form" is a "scanned" "hard copy form." A760. The judgment of non-infringement should be affirmed.

### *Capital One's Cross-Appeal*

## I.    STANDARD OF REVIEW

This Court reviews *de novo* the district court's Rule 12(b)(6) dismissal under Fourth Circuit law. *See Superior Indus., LLC v. Thor Global Enters. Ltd.*, 700 F.3d 1287, 1292 (Fed. Cir. 2012); *Ballard v. Bank of Am., N.A.*, 734 F.3d 308, 310 (4th Cir. 2013). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, it must only plead sufficient facts "to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.*

## II.    IV'S SCHEME TO MONOPOLIZE A TECHNOLOGY MARKET PLAUSIBLY VIOLATED THE SHERMAN ACT

Section 2 of the Sherman Act condemns monopoly power achieved other than through a superior product, business acumen, or historic accident. 15 U.S.C.

§ 2.   A monopolization claim under Section 2 requires "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power."  *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

In its Eleventh Counterclaim, Capital One alleged that (1) IV acquired monopoly power in licensing "technology enabling business processes common throughout the commercial banking industry in the United States" with facts supporting the contours of that market (and a plausible submarket consisting of IV's portfolio) as well as IV's dominant position, A5026-34 ¶¶ 61-80; and (2) IV willfully acquired monopoly power by secretly aggregating thousands of patents, eliminating any option to avoid IV's patent portfolio, hiding the contents of its portfolio, and engaging in sham litigation, A5032 ¶ 74.   Therefore, Capital One alleged facts plausibly supporting each element.

The patent laws do not insulate IV's strategy from antitrust scrutiny.  *See*, *e.g*., *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2231 (2013) (declining to measure a "settlement's anticompetitive effects solely against patent law policy" and finding settlement illegal under the antitrust laws).   That is precisely what another court correctly held a few weeks ago in determining that allegations of illegal monopolization against IV require factual development.   *Intellectual Ventures I*

*LLC*, 2014 WL 4773954, at *3-4. The district court erred in holding otherwise here.

## A.  Capital One Alleged A Plausible Scheme Of Anticompetitive Conduct

The district court held that Capital One had failed plausibly to allege that IV willfully acquired monopoly power through anticompetitive conduct. That holding reflected numerous errors of antitrust law. Because the court's misapprehensions on that issue infected the rest of its analysis, we begin with the core issue.

### 1.  Capital One Does Not Have To Compete With IV To Challenge Monopolization

The district court held that Capital One's allegations fail because they did not "allege that Capital One and IV compete with each other in the relevant market." A5193. That is incorrect as a matter of law. A *purchaser* in a market (like Capital One) can sue, and indeed is the preferred plaintiff to sue, for that market's monopolization. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979); *Ritz Camera & Image, LLC v. SanDisk Corp.*, 700 F.3d 503, 505 (Fed. Cir. 2012); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 345 (2014) ("Because protecting consumers from monopoly prices is the central concern of antitrust, buyers have usually been preferred plaintiffs in private antitrust litigation."). This error permeates the district court's opinion.

### 2.    The District Court Wrongly Assumed That Market Power Flowing From Patent Grants Is Necessarily Lawful

The district court did not "understand[] how threats of litigation to enforce presumably valid patents can render unlawful license fees that would otherwise be lawful." A5192. In criticizing the supposed absence of "any fact-based explanation concerning why IV's acquisition of presumed valid patents becomes unlawful," A5193, the district court made the common mistake of thinking that any market power a patentee exercises lawfully flows from the patent grant. That is not the law.

Assembling a patent portfolio by acquisition is unlawful when it creates or enhances market power that did not exist when the patents were separately owned—even if that power was derived from the strength of valid patents. *See, e.g.*, *Actavis*, 133 S. Ct. at 2232 (citing with approval *United States v. Singer Mfg. Co.*, 374 U.S. 174, 190-92 (1963) (acquiring patents to exclude a mutual competitor is illegal)); *Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416, 423-25 (10th Cir. 1952) (acquiring patents to "corner the hydraulic pump business for oil wells" constituted illegal monopolization); *United States v. Westinghouse Elec. Corp.*, 648 F.2d 642, 647 (9th Cir. 1981) ("[A] patent holder may run afoul of the antitrust laws . . . by expand[ing] its monopoly by . . . accumulation."). And antitrust law has always been particularly concerned about efforts to aggregate large, and potentially unavoidable, IP portfolios and demand portfolio licenses—

58

cutting off a licensee's prior option to negotiate individually with the rights holders. *See, e.g.*, *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 24 (1979) (aggregating licensing permissions and selling blanket license could be illegal if aggregator imposed "legal, practical, or conspiratorial impediment to obtaining individual licenses" leaving purchasers with no "real choice"); *Radio Music License Comm., Inc. v. SESAC, Inc.*, No. 2:12-cv-5807, 2014 WL 2892391, at *11 (E.D. Pa. June 26, 2014). The largest music copyright aggregators—BMI and ASCAP—have operated under antitrust consent decrees for decades for that reason.

IV's acquisition of thousands of patents to create monopoly power in licensing commercial-banking technology is thus subject to antitrust scrutiny. Indeed, a court applying those principles just last month denied IV's motion for judgment on the pleadings, on allegations of monopolization virtually identical to those here. *Intellectual Ventures I LLC*, 2014 WL 4773954, at *2-4 (refusing to strike patent misuse defense). The court held that, as in *Kobe*, the potential antitrust violation "stems from [IV's] aggregation of patents in the relevant market, patents that [IV] assert[s] against alleged infringers in the relevant industry in order to maintain a monopoly with anticompetitive results." *Id.* at *4. The court rejected IV's reliance on the (mistaken) dismissal of the antitrust claims in this case. It properly recognized that whether the allegations can be proven turns on "the

resolution of factual and legal questions and cannot be done at this stage." *Id.* The same is true here.

Indeed, the facts here are more troubling than in the *BMI* and *Radio* cases noted above, because IV eliminated *all* choice by acquiring outright ownership of collectively unavoidable patents, rather than by securing licensing authority alone to protect competition among the original patentees. *See also Meredith*, 2011 U.S. Dist. LEXIS 24517, at *49-50 (evidence that IP aggregator prevented prospective licensees from directly licensing from aggregator's copyright-owning members created jury question on Section 2 claim).

Moreover, IV refused to disclose the full contents of its portfolio, concealed its acquisitions and, therefore, prevented licensees from evaluating potential marketplace alternatives. A5029 ¶ 69. That conduct is also anticompetitive. *See Radio*, 2014 WL 2892391, at *11; *Xerox Corp.*, 86 F.T.C. 364 ¶ 14(c) (1975) (patent aggregator harmed competition by "developing and maintaining a patent structure of great size, complexity, and obscurity of boundaries"). Efforts to conceal from consumers what the seller asks them to purchase serve no legitimate procompetitive purpose.

The district court described IV's strategy as a benign attempt to assert "patents, whose enforcement, outside of their inclusion in IV's portfolio, would not be economically sensible." A5193. But the antitrust laws do not permit IV to

increase the marketplace leverage associated with individual patents by aggregating them together to achieve or enhance otherwise-absent monopoly power. The district court's implicit analogy to consumer class-action litigation is both irrelevant (because there is no public policy favoring increased patent enforcement that could trump antitrust law in this context) and incorrect (because class actions do not eliminate competition, and they do not aggregate thousands of unrelated legal claims to make the legal claims unavoidable regardless of the merits).

And the law does not insulate IV's conduct from antitrust scrutiny merely because Capital One has alleged that the patents are *invalid*. IV's acquisition-and-licensing strategy is unlawful because it produces monopoly power. Patent invalidity makes an antitrust problem more, not less, severe, as the Supreme Court recently emphasized in *Actavis*.

### 3.     *Noerr-Pennington* Does Not Immunize IV's Conduct

The district court viewed IV's threatened sham litigation as "[c]entral" to Capital One's theory of monopolization, and held that Capital One had not alleged a recognized exception to *Noerr-Pennington* immunity. A5194. The court erred.

First, IV's litigation threats are merely part of Capital One's allegations. As discussed above, the *other* aspects of IV's conduct (acquisition and secrecy) support an antitrust claim independent of any litigation by IV. *Noerr-Pennington*

61

does not immunize pre-litigation conduct from scrutiny merely because it precedes a lawsuit. *See, e.g.*, *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1264 (9th Cir. 1982). IV acquired monopoly power by secretly amassing the largest active patent portfolio of all time, refusing to disclose the actual contents of that portfolio, *and* credibly threatening to use the litigation process (as opposed to litigation outcomes) to impose an endless series of expensive patent cases on its targets. IV's litigation threats are only one prong of that strategy, and the court erred by analyzing it in isolation. *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("[Antitrust] plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.").

Second, the court too quickly concluded that *Noerr-Pennington* immunity protects IV's litigation strategy. Capital One plausibly alleged that part of IV's monopolization strategy is to threaten serial litigation without regard to the merits. A5031-32 ¶ 74(c). IV does not sue to obtain reasonable royalties over the handful of patents-in-suit. Rather, it subjects its targets to millions of dollars in litigation costs per case and the associated knowledge that the lawsuits will never end until the target buys a license to thousands of patents not in suit. That strategy derives coercive leverage from the litigation process (as IV's documents show)—rather than the anticipated outcomes of any case—and has nothing to do with any

leverage that the individual patents may lawfully confer. A5015; A5029 ¶ 69; A5031-32 ¶ 74 (c).

The district court analyzed cases holding that a single lawsuit, divorced from any other proceeding, is sham if it is both objectively baseless and motivated by a subjective purpose to harm competition. *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993) ("*PREI*"). Although this Court has not yet addressed the question, every U.S. Court of Appeals to address it has held that *PREI* does not apply to a "whole series of legal proceedings." *Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*, 728 F.3d 354, 363 (4th Cir. 2013); *Primetime 24 Joint Venture v. NBC*, 219 F.3d 92, 101 (2d Cir. 2000); *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 811 (9th Cir. 1994). When an anticompetitive strategy entails a series of lawsuits, the question is whether the litigant has filed "a pattern of baseless, repetitive claims" showing an abuse of the judicial process. *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972). Capital One alleged precisely that and ultimately demonstrated that all five of IV's patents in this lawsuit were invalid or not infringed, and has already forced IV to drop one patent in IV's second suit. Factual development is often necessary to assess whether litigation is a sham. *Tyco Healthcare Grp. LP v. Mutual Pharm. Co.*, 762

F.3d 1338 (Fed. Cir. 2014). Here, the district court erred by not allowing Capital One to take discovery to prove its allegations.

The "sham" exception to *Noerr-Pennington* reflects the fact that would-be monopolists may not "use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 380 (1991). Indeed, after Capital One defeated every one of IV's first five patents, IV announced that "our patent portfolio is deep and we have another action pending against Capital One in Maryland"[3]—showing that IV's threat is based on the depth of its portfolio, not the merits of any particular patents. IV conducts licensing negotiations this same way. IV avoids any discussions of the merits of any particular patents and negotiates based on the size of its portfolio. *See* A5013-14.

Admittedly, IV's conduct raises issues on the cutting edge of antitrust-and-patent law. But it cannot be that a monopolization strategy effectuated in part (but only in part) by threats of serial, sham litigation becomes subject to antitrust scrutiny only after the patentee loses dozens of lawsuits. Such a rule would ignore the practical reality that recipients of threats like these often cannot afford to litigate a long series of cases—particularly when they are as expensive as patent

---

[3] http://www.intellectualventures.com/news/legal-updates/virginia-court-dismisses-patents-in-first-case-against-capital-one/.

cases. Indeed, that rule would ignore an antitrust defendant's right to injunctive relief against merely "threatened loss or damage by a violation of the antitrust laws," 15 U.S.C. § 26, which is supposed to be available *before* the anticompetitive scheme has been carried out. *See, e.g.*, *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 597 (1957). IV has sued U.S. banks en masse, and has sued Capital One once without success and has already dropped a patent from the second suit. With the benefit of discovery, Capital One could show what IV's reluctant partial production already does: IV files its serial lawsuits to impose high litigation costs on its targets to force them to pay monopoly prices.

## B.    Capital One's Market Allegations Are Sufficient At This Stage

### 1.    The Plaintiff And Defendant Need Not Compete

The district court wrongly held that a properly defined antitrust market must allege an "'area of effective competition' between IV and the commercial banks who are the alleged victims of IV's anticompetitive conduct." A5189. That is not the law. *Supra* at 57. The choices available to customers in dealing with sellers define the relevant market, which has nothing to do with whether the plaintiff and defendant compete with one another. *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 481-82 (1992) ("The relevant market for antitrust purposes is determined by the choices available to [consumers.]"); *accord E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011).

**CONFIDENTIAL MATERIAL OMITTED**

## 2.    Capital One's Market Definition Allegations Easily Suffice

The district court also erred in concluding that no "recognized antitrust jurisprudence" would entertain Capital One's market definition, and in dismissing the case rather than permitting fact and expert development. Capital One's market allegations fall squarely within antitrust law in several ways.

As a threshold matter, Supreme Court and Fourth Circuit precedent confirm a strong reluctance to grant Rule 12 motions addressing market definition. As the Supreme Court has observed, "proper market definition . . . can be determined *only after a factual inquiry* into the 'commercial realities' faced by consumers." *Kodak*, 504 U.S. at 481-82 (emphasis added). And, recently, in reversing a Rule 12(b)(6) dismissal, the Fourth Circuit emphasized that "dismissal of an antitrust claim for failure to adequately plead the relevant market can be problematic . . . '[b]ecause market definition is a deeply fact-intensive inquiry.'" *Kolon*, 637 F.3d at 443-44 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001)); *accord Newcal Indus. v. IKON Office Solutions, Inc.*, 513 F.3d 1038, 1045 (9th Cir. 2008). Here, even the tangential, patent-related discovery showed that IV tacitly admits that there is a relevant market—because it cannot have [[                    ]] without a relevant market. A5211. Capital One should be entitled to antitrust discovery to further define its alleged market—and explore what IV believes is the relevant market.

Capital One alleged that the relevant market is for licensing "technology enabling business processes common throughout the commercial banking industry in the United States." A5030-31 ¶¶ 71-73; A5033 ¶ 77; A5035-36 ¶¶ 82, 84, 90. The district court thought a properly defined market must exclusively comprise substitutes. A5199. But binding Supreme Court precedent recognizes cluster markets comprised of "different"—that is, non-substitutable—products when purchasers consider them together. *See Grinnell*, 384 U.S. at 572 ("We see no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities."); *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 355-56 (1963) (same). That is precisely the case here because IV has created a bottleneck of banking technologies (patents), and the district court erred holding otherwise. Indeed, the fact that IV conceals the actual content of its portfolio reveals that IV itself believes that it is the size of its portfolio that reflects commercial realities, not the precise technology alternatives available to its targets.

Capital One also alleged that the market arises *ex post*, since IV targets processes in which banks have already invested. That sunk investment makes it more difficult for banks to switch to substitutable processes in response to patent assertion, and IV's business of massive patent aggregation, concealment and sham litigation make this difficulty an impossibility. A5027-28 ¶ 65. That, too, is a

conventional antitrust allegation, and perfectly plausible on these facts. *See Kodak*, 504 U.S. at 476-77 (lock-in can create a distinct market); *The Evolving IP Marketplace, supra*, at 50-72 (patent assertion entities operate in *ex post* technology-licensing markets with negative effects).

Capital One further pointed out that its allegations supported a distinct market (sometimes called a "submarket") limited to IV's portfolio because IV alleged that its portfolio license is indispensable to commercial banking. The district court was skeptical that a single firm's product could be an antitrust market. But, this is not a single product market. This market includes over 3,500 patents that IV contends are collectively unavoidable, and recent decisions hold that an IP portfolio constitutes its own market when a license to it is unavoidable. *See Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180 (S.D.N.Y. 2014); *Meredith*, 2011 U.S. Dist. LEXIS 24517, at *28; *see also Broad. Music*, 441 U.S. at 24 (a blanket license to a copyright aggregator's portfolio "is, to some extent, a different product" than licenses to "the individual compositions"). And, in any event, a single firm's product market is perfectly plausible as found in cases like *Kodak* and *Broadcom*. Indeed, the point of cases like *Kodak* is that, if customers have no practical alternatives to purchasing some input, they are helpless against monopolistic pricing demands. Nothing in those cases holds that the customers must be legally required to buy the input for a market to exist. To the contrary,

commercial realities facing consumers control market definition.  *Kodak*, 504 U.S. at 481-82.  Capital One cannot avoid IV's nine-figure license demands, and no substitute exists for a license to IV's portfolio.  Those allegations plausibly show the existence of a portfolio market.[4]

At bottom, the facts alleged by Capital One show a plausible (at least) antitrust claim even accepting the district court's (incorrect) premise that the relevant market must exclusively comprise substitute technologies.  Capital One has alleged that IV has, through a combination of massive targeted acquisitions, secrecy, and the ability to impose endless litigation costs, created a situation in which commercial banks must take a license from IV or face endless litigation without any viable alternatives.  A5029 ¶ 69; *supra* at 5-8.  IV itself takes this position in licensing negotiations.  And IV's extraordinary success in extracting licensing fees makes clear that it is plausible.

### C.    Capital One Plausibly Alleged Monopoly Power

IV is the world's largest patent aggregator and routinely sells licenses for hundreds of millions of dollars apiece.  That IV has the power to control price is thus beyond debate.  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S.

---

[4]    And it is not true that "Capital One effectively alleges there is no commercial market for IV's patent portfolio."  A5191.  Capital One alleged that IV actively seeks to license its portfolio, and has secured hundreds of millions of dollars each from Verizon, Intuit, and Cisco.  A5029-30 ¶¶ 70-71.

**CONFIDENTIAL MATERIAL OMITTED**

377, 391 (1956) ("Monopoly power is the power to control prices or exclude competition."). Yet, the district court thought it implausible that IV has monopoly power. But, in the post-dismissal, patent discovery, [[

]] A5211. Capital One should be allowed discovery to show why.

The district court deemed Capital One's "allegations that IV has demanded and received 'supracompetitive prices'" to be "conclusory," and held that "Capital One does not allege specifically that IV charges or demands license fees higher than other patent holders." A5192. But, Capital One alleged as much as any antitrust plaintiff could be expected to allege at the pleadings stage.

Capital One alleged specific prices at which IV has successfully licensed victims in other industries, and also alleged facts revealing a strong case—and certainly a plausible one—that those payments exceeded any fair competitive baseline (including what IV paid to acquire its patents). *See Actavis*, 133 S. Ct. at 2236 ("higher-than-competitive profits" are "a strong indication of market power"); *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (profitably raising price substantially above the competitive level demonstrates monopoly power). Capital One specifically alleged that IV extracted $350 million from Verizon Communications, $120 million from Intuit Inc., and between $200 million and $400 million from Cisco Systems, Inc., A5029-30 ¶ 70, and that "the hundreds of millions of dollars Intellectual Ventures has forced its targets in other

**CONFIDENTIAL MATERIAL OMITTED**

industries to pay" plausibly evidences IV's power, A5030 ¶ 71.  Capital One also

alleged that the patents that IV licenses commanded no monopoly power before

their aggregation, A5029 ¶ 69, and that "Intellectual Ventures has increased the

price of patent licenses in the relevant market," A5034 ¶ 78.  And, the limited

discovery that was exchanged in the patent case revealed [[


]]  *Supra* at 6-7; A5211.

Capital One's allegations focused on IV's success in other industries only because

IV started there.  Its strategy in those industries was the same one it is now

pursuing in the banking industry.

### D.    Capital One Has Suffered Antitrust Injury

IV's targeted patent aggregation, concealment, and assertion predictably

cause Capital One to suffer antitrust injury (A5034 ¶ 78)—"injury of the type the

antitrust laws were intended to prevent and that flows from that which makes

defendants' acts unlawful."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429

U.S. 477, 489 (1977).  Beyond raising the price of patent licenses in the market, IV

has subjected Capital One to millions of dollars in litigation costs and, in taxing its

independent innovation, has decreased Capital One's incentive to innovate.  *See,*

*e.g.*, *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 149

(4th Cir. 1990).  IV's anticompetitive conduct has put Capital One to a harmful

choice: pay a monopoly price for IV's license, spend millions of dollars in litigation, or exit the banking industry. That harm is a classic form of antitrust injury. *See Dairy Foods Inc. v. Dairy Maid Prods. Coop.*, 297 F.2d 805, 808 (7th. Cir. 1961).

###### E.    Capital One At Least Plausibly Pled *Attempted* Monopolization

Section 2 of the Sherman Act also prohibits attempted monopolization. 15 U.S.C. § 2; *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *H.J., Inc. v. Int'l Tel. & Tel. Corp.*, 867 F.2d 1531, 1543 (8th Cir. 1989). At a minimum, for the reasons discussed, Capital One plausibly alleged that IV "engaged in . . . anticompetitive conduct," acted with "specific intent" to acquire monopoly power in a relevant market, and has at least "a dangerous probability" of doing so. *Spectrum Sports*, 506 U.S. at 456; *see* A5034-35 ¶¶ 81-87 (Counterclaim Twelve). Capital One has also plausibly alleged attempted monopolization.

## III.    IV'S ANTICOMPETITIVE ACQUISITIONS PLAUSIBLY VIOLATED SECTION 7 OF THE CLAYTON ACT

For many of the same reasons discussed above, Capital One also stated a plausible claim that IV has violated Section 7 of the Clayton Act, which proscribes asset acquisitions the effect of which "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18; *see* A5036-37 ¶¶ 88-94 (Counterclaim Thirteen). Section 7 forbids patent acquisitions that give the acquiring party the "ability and incentive" to assert those patents with

**CONFIDENTIAL MATERIAL OMITTED**

anticompetitive effect.  U.S. DOJ & FTC, *Horizontal Merger Guidelines* § 1 and generally (2010); *see*, *e.g*., *Phila. Nat'l Bank*, 374 U.S. at 363 (large-scale acquisitions presumptively harm competition and "must be enjoined" absent contrary evidence).

The district court acknowledged that Section 7 "can be applied to the acquisition of patents" (indeed, it routinely is), but reasoned that in this case "the alleged anticompetitive effects . . . arise from IV's litigation threats" rather than from "IV's acquisitions, standing alone."  A5197-98.  As explained (*supra* at 5-8), Capital One alleged that IV has pursued an integrated strategy that includes massive, secretive acquisition of [[          ]] patents, concealment of its portfolio, and threats of serial litigation.  That strategy cannot be reduced to its last element, and the fact that IV threatens lawsuits does not insulate the prior acquisitions from antitrust scrutiny.  Anticompetitive patent acquisitions are actionable precisely because they facilitate harmful patent assertion later.  *See Actavis*, 133 S. Ct. at 2232 (firms violate antitrust law in "assigning the broadest claims to the firm best able to enforce the patent against yet other potential competitors").  And Capital One certainly can challenge IV's patent acquisitions under Section 7 even if their "anticompetitive effects arise at some point after the acquisition."  A5197; *see E.I. du Pont de Nemours & Co.*, 353 U.S. at 592 (Section 7 violation exists if "there

was *at the time of suit* a reasonable likelihood of a monopoly of any line of commerce" (emphasis added)).

The district court improperly objected to the lack of alleged "facts, including the identity of any particular patents or when they were acquired, that make plausible its claim that the effect of IV's patent acquisition" violated Section 7. A5197-98. This holding ignores the allegation that IV masks its patent acquisitions behind 2,000 shell companies and refuses to disclose the full contents of its patent portfolio and that this was only the pleading stage. A5027 ¶ 63; A5031 ¶ 74(b). The court thus rewarded IV for its anticompetitive conduct. In any event, Capital One need not identify each patent and the time of its acquisition to state a plausible Section 7 claim in this context. The malign genius of IV's anticompetitive scheme is that it renders the actual, particular patents irrelevant.

## CONCLUSION

The Court should affirm the district court's judgment of invalidity of the '137 and '382 patents and non-infringement of the '587 patent. The Court should reverse the district court's order dismissing Capital One's antitrust counterclaims and remand for further proceedings on those counterclaims.

Dated: October 14, 2014

Jeffrey G. Homrig
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
(650) 328-4600

Robert A. Angle
Dabney J. Carr IV
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, VA 23219
(804) 697-1246

Respectfully submitted,

/s/ Matthew J. Moore
Matthew J. Moore
Abbott B. Lipsky, Jr.
J. Scott Ballenger
Marguerite M. Sullivan
Gabriel K. Bell
LATHAM & WATKINS LLP
555 Eleventh St. NW, Suite 1000
Washington, DC 20004
(202) 637-2200
matthew.moore@lw.com

*Counsel for Cross-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2014, I electronically filed the Confidential and Non-Confidential version of the Brief of Cross-Appellants with the Clerk of the United States Court of Appeals for the Federal Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

I further certify that I caused copies of the Confidential Version of the Brief of Cross-Appellants to be served via FedEx next-day delivery upon the following:

Marc Belloli, Attorney
Feinberg Day Alberti & Thompson LLP
1600 El Camino Real
Suite 280
Menlo Park, CA 94025
(650) 618-4360
mbelloli@feinday.com

Dated:  October 14, 2014                    /s/ Matthew J. Moore
                                            Matthew J. Moore

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fed. R. of App. P. 32(a)(7)(B) because the brief contains 16,487 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because this brief was prepared using Microsoft Word 2003 in 14-point Times New Roman font.

Dated:  October 14, 2014                    /s/ Matthew J. Moore
                                            Matthew J. Moore